607 So.2d 1171 (1992)
William Wayne JENKINS
v.
STATE of Mississippi.
No. 89-DP-1293.
Supreme Court of Mississippi.
September 10, 1992.
*1173 Paul R. Scott, Wilroy Scott & Rutherford, Hernando, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
PITTMAN, Justice, for the Court:
William Wayne Jenkins was tried and convicted in the Circuit Court of DeSoto County, Mississippi, for the capital murder of Dawn Jones. He was sentenced to death. From his conviction and sentence he appeals to this Court assigning numerous errors. Finding reversible error at both phases of the lower court proceeding, we reverse and remand for a new trial.

THE FACTS
During the afternoon of December 5, 1988, Leroy Jones was at his place of business when he received a telephone call from his young son relating that the family's mobile home was locked and that he was unable to get inside. Mr. Jones, being concerned, left his business and arrived at home finding the family residence in disarray and his wife on the bedroom floor with her throat severed. Leroy Jones immediately called the DeSoto County Sheriff's Department.
A few hours into the homicide investigation, William Wayne Jenkins became a suspect in the murder of Dawn Jones. Investigators learned that Ms. Jones had been on the telephone with her mother when she stated that she needed to answer the door because "Billy" was there. William Wayne "Billy" Jenkins was arrested by the DeSoto County Sheriff's Department at approximately 8:00 p.m. on December 5, 1988.
When initially interrogated by police, Billy Jenkins stated that he received a knife wound to his hand during an attempted robbery in Memphis earlier that morning. He said that he was at a gas station when a large white male approached him for his wallet. Jenkins stated that after refusing to surrender his money, he was stabbed by the man who fled on foot. Jenkins informed the interrogating officers that he had filed a police report with the Germantown Police Department at approximately 10:30 a.m.
After investigators had a more complete picture of the crime, Billy Jenkins was again interrogated by officers of the DeSoto County Sheriff's Department and the Mississippi Highway Patrol. During this interrogation, Jenkins gave police a signed confession to the killing of Dawn Jones. Jenkins stated that on the morning of December 5, 1988, he went to the home of Ms. Jones to continue the sexual relationship ongoing between the couple. He stated that once inside the Jones' trailer, Dawn began to resist his advances towards her. Billy Jenkins related that he grabbed Jones and began to carry her to the rear bedroom *1174 when she picked up a butcher knife and stabbed him in the left hand. Jenkins said that he went crazy, found a second knife and chased Jones into the bedroom where they fought with the knives. Jenkins informed his interrogators that he remembered cutting Dawn Jones' throat and that he then rummaged through the bedroom in search of cocaine. Finding none, Billy Jenkins locked the door of the mobile home and left.
Based upon this confession, William Wayne Jenkins was indicted by the Grand Jury of DeSoto County for the capital murder of Dawn Jones; his trial date was set and numerous pre-trial motions were entertained by the circuit court. Among these motions was a Motion to Suppress the statement taken on December 6, 1988. At the suppression hearing, held on September 20, 1989, Officers Bud Smith and Creekmore Wright testified for the State, while Jenkins himself testified for the defense. Judge Carlson, after receiving the evidence presented, denied Jenkins' Motion to Suppress.
On September 26, 1989, Billy Jenkins was tried in the Circuit Court of DeSoto County for the capital murder of Dawn Jones. During Jenkins' trial, the State introduced evidence to establish that Billy Jenkins was not sexually involved with Dawn Jones but, rather, that he went to the Jones' mobile home for the specific purpose of committing a robbery therein. Leroy Jones, one of the State's key witnesses, testified that a tool box containing silver coins, a pistol, and various tools was stolen from the bedroom closet of his home. Further, Mr. Jones informed the jury that $60.00 was taken from a small lock-box located inside of the filing cabinet in his bedroom. This testimony was supported by photographic evidence recording the bloody filing cabinet and blood-stained lock box.
Moreover, an employee of the State Crime Lab testified that the blood recovered from the scene of the crime matched that of Billy Jenkins. Kathy Brock informed the jury that the blood found in the bedroom of the mobile home and the blood sample drawn from Billy Jenkins were both blood type O, PGM type 21. Next, molecular biologist George Herrin testified that his company, Cellmark Diagnostics, Inc., had matched the DNA banding patterns of the blood stains recovered at the crime scene with the known DNA patterns of Billy Jenkins. He stated that the chance for error in this match was only one in 480,000.
At the conclusion of the guilt phase, the jury found Jenkins guilty of capital murder. In due course, the trial entered the penalty phase and, in the end, the jury found that Jenkins should suffer the death penalty. This appeal followed.

GUILT PHASE

I. Preliminary Hearing

Rules 1.04 and 1.07 of the Miss.Unif. Crim.R. of Cir.Ct.Prac. contain an accused's right to a preliminary hearing. In relevant part, Rule 1.04 states:
The judicial officer shall inform the defendant of his right to a preliminary hearing, and a date for such hearing shall be set within a reasonable time. The preliminary hearing shall be heard on the set date, unless it is waived in writing or in open court and upon the advice of counsel.
Rule 1.07 provides the manner in which the preliminary hearing must be held. It states that "[t]he preliminary hearing shall be heard by a judicial officer on the date set for such hearing at the defendant's initial appearance." This Court has held that these rules mean what they say "nothing more, nothing less." Hansen v. State, 592 So.2d 114, 122 (Miss. 1991) cert. denied, ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992).
Jenkins is correct in asserting that he was entitled to a preliminary hearing under Rules 1.04 and 1.07 of the Uniform Criminal Rules of Circuit Court Practice. The failure to require such a hearing, however, will not result in reversible error unless Jenkins can show prejudice below. See Willie v. State, 585 So.2d 660, 670 *1175 (Miss. 1991); Avery v. State, 555 So.2d 1039, 1043 (Miss. 1990).
In today's case, Jenkins says he was prejudiced by the lack of a preliminary hearing because he was unable to question witnesses Kathy Brock and Dr. George Herrin, Jr., concerning their intended testimony at trial. We disagree. Billy Jenkins was indeed prejudiced when the lower court allowed these witnesses to testify in violation of our rules of discovery. Appellant was not, however, prejudiced by the trial court's failure to grant a preliminary hearing when Jenkins had the benefit of several pre-trial hearings as well as the grand jury process leading to his indictment. Our review of the record suggests that the appellant was afforded all, or substantially all, of the benefits he would have expected at a preliminary hearing. As such, we find that the violation of Jenkins' right to a preliminary hearing was harmless.

II. Admissibility of Confession

During the early morning hours of December 6, 1988, Billy Jenkins gave a written confession implicating himself in the murder of Dawn Jones. On appeal to this Court, Jenkins asserts that this confession was not voluntarily given because he was physically coerced by interrogating officers and, further, because he was under the influence of various narcotics at the time of his recorded statement. Our review of appellant's claim is limited and we will not reverse the ruling of the trial court unless it was manifestly erroneous or against the overwhelming weight of the evidence. Davis v. State, 551 So.2d 165, 169 (Miss. 1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 797 (1990).
The admission of a drug-induced confession would clearly violate a defendant's right against self-incrimination guaranteed by the U.S. Constitution and the Mississippi Constitution. See Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659 (1964). The admission of a confession that was the product of physical or psychological coercion would likewise be inadmissible as a violation of appellant's rights. See Powell v. State, 483 So.2d 363, 368 (Miss. 1986). Nevertheless, our review of the record below suggests that the lower court was clearly within its discretion, and thus not manifestly in error, when it found Jenkins' statement to be voluntary beyond a reasonable doubt. Officers Smith and Wright testified that Billy Jenkins was alert and "straight" at the time of his confession. Jenkins himself confessed to being competent and uncoerced at the time of his recorded statement. Therefore, we must conclude that Judge Carlson did not err when admitting Jenkins' confession below. This assignment of error lacks merit.

III. The Admission of Photographs and the Use of a Slide Projector

Billy Jenkins asserts that the trial court erred by admitting the photographic evidence offered by the State and, further, by allowing the State to use a slide projector to present this inflammatory evidence to the jury. We disagree.
First, this Court has consistently held that the admissibility of photographic evidence rests within the sound discretion of the trial judge. The lower court's ruling will be upheld on appeal unless abuse of discretion can be shown. Ladner v. State, 584 So.2d 743, 753-54 (Miss.), cert. denied, ___ U.S. ___, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); Mackbee v. State, 575 So.2d 16, 31 (Miss. 1990). "[P]hotographs of bodies may be admitted into evidence where they have probative value, and where they are not so gruesome as to be overly prejudicial and inflammatory." Stringer v. State, 500 So.2d 928, 934 (Miss. 1986). In today's case, the photographs admitted into evidence recorded different wounds to the body of the victim. Prosecution Exhibits 11 and 12, depicting the knife protruding from the victim's throat, were indeed graphic but not overly gruesome or inflammatory. Thus, the trial judge was within his discretion in determining that their probative value outweighed any prejudice to Billy Jenkins.
*1176 Next, Jenkins asserts that the use of a slide projector to enhance the testimony of Officer Bud Smith served only to inflame the jury and constitutes reversible error on appeal. In Stringer, this Court denounced the prosecution's use of a "slide show" during their closing argument. Id. at 935. The Court found that this tactic was an unnecessary means of inflaming the jury and was, in combination with other prejudicial tactics, reversible error. In the case sub judice, the projector use was limited to aiding the testimony of the witness, Smith, and was not used in closing argument. In Smith v. State, 419 So.2d 563 (Miss. 1982), cert. denied, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983), we ruled that the use of a slide projector was a matter within the discretion of the trial judge. This Court noted that issues of competency, relevancy, and materiality were within the lower court's discretion.
We agree that the State should not use a "slide show" in an attempt to inflame the jury in closing arguments. See Stringer, 500 So.2d at 935. We do not agree, however, that the use of a slide projector to enhance the testimony of Officer Bud Smith was improper in today's case. The trial judge simply ruled that the use of the slide presentation would allow the jury to follow the testimony of Officer Smith by viewing the slides as the witness related his findings. Certainly this Court will encourage trial courts to use modern and proper techniques to aid the jury in understanding the witness or other evidence. Our review of the record reveals no error in the trial judge's ruling. In fact the use of the slide projector was conducive to an improved trial. This assignment of error, therefore, is without merit.

IV. Discovery Violation

On May 2, 1989, District Attorney Robert Williams responded to defense counsel's discovery request with a list of potential witnesses. The names of forensic scientist Kathy Brock and molecular biologist Dr. George Herrin, Jr., were not included in that response. Trial was set for June 19, 1989.
On June 12, 1989, the parties came before the circuit court for a hearing on defense counsel's Motion For Continuance. At that hearing, defense attorneys informed the court that three days earlier, they had received the fingerprint reports and serological reports from the prosecution. Counsel noted that the serological report of Ms. Kathy Brock was dated April 11 and the fingerprint analyst's report was dated May 5. In addition, defense attorneys presented a list of uncompleted tests to be performed by the Crime Lab and expressed their concerns that the tests could provide valuable exculpatory information.
The prosecution initially resisted the granting of a continuance in this matter. District Attorney Williams informed the lower court that he would stipulate to the reports of Ms. Kathy Brock and the fingerprint analyst if that would prevent a continuance. He stated that the reports were negative to his case and that he did not intend to call Ms. Brock or the fingerprint analyst at trial.
The lower court continued the trial date of Billy Jenkins until September 26, 1989.
On August 30, 1989, a report from Cellmark Diagnostics, signed by Dr. George Herrin, Jr., provided that "[t]he DNA banding pattern obtained from the blood stain from the rear door threshold matched the DNA banding pattern obtained from the blood labelled William Jenkins." Defense counsel received this report on September 9, 1989.
On September 22, 1989, Cellmark Diagnostics issued a report containing a DNA match between the blood samples taken from the crime scene and the known blood samples of Billy Jenkins. The report provided that "the DNA banding pattern obtained from the blood stain from the rear door threshold and the blood of William Jenkins has a frequency in the Caucasian population of approximately one in 13 hundred." Defense counsel stated in his brief that this report was tendered on the day before trial.
*1177 On September 25, 1989, Cellmark Diagnostics issued a third report that provided further DNA test results. The report, signed by Dr. George Herrin, Jr., stated that the probability of the DNA match being erroneous was only one in 480,000. Defense counsel stated in brief that he received this report on the first day of trial.
At Billy Jenkins' trial, Ms. Kathy Brock was called to testify regarding the serological tests completed by the Mississippi Crime Lab. Defense counsel objected to Ms. Brock testifying because her name was never provided in answer to discovery requests. In response to the objection of the defendant, the prosecution stated that Dr. George Herrin, Jr., from Cellmark Diagnostics, would also be called by the State and that his name was not listed as a prosecution witness. The lower court, in light of the objection, asked defense counsel to interview the two witnesses over an extended lunch break and determine the nature of their testimony. When the parties returned from lunch, defense counsel asked for a continuance of trial so that more preparation could be done for these witnesses. The lower court, after considering the arguments of counsel, held as follows
Obviously, this is not the routine situation that is presented in a matter of a discovery violation. Usually it will come up in the context of a witness being called who was not mentioned anywhere or not listed in discovery in any shape, form or fashion, have no idea what that witness is being called to testify to or some piece of evidence has shown up and has not been disclosed to counsel opposite. Obviously, as I see it, that's the reason for the rule. That's the reason for the guidelines as set out in Box and later cases.
Up to this point I've been certainly trying to afford defense counsel the opportunity and did afford them the opportunity to talk with Ms. Brock and Dr. Herrin.
I recognize what they're saying, but my ruling will be that based upon the reports which were furnished, and zeroing in on Ms. Brock this point, the report was furnished, and I just can't see any prejudice to this defendant on that point regarding Ms. Brock. I don't see any different situation that we would be in as far as the practical effects of this situation say if Ms. Brock had been actually listed in Paragraph 1 of the response. I don't see any surprise or prejudice that would be there.
So the record has been made. The motion has been made. And I will allow the witnesses to testify and, again, certainly, hopefully, make sure that defense counsel is afforded the opportunity for full cross-examination, which I think really what it will boil down to when all of this is laid out is how the jury wants to view that testimony.
Kathy Brock testified at trial that she found the blood samples recovered from the rear door of the trailer to be blood type O, enzyme type PGM 1. She stated that this finding coincided with the blood and enzyme type of the appellant. Next, Ms. Brock informed the jury that only twenty-seven percent (27%) of the people with blood type O had enzyme type PGM 1. Brock stated that Dawn Jones had blood type, O enzyme type PGM 21.
Dr. George Herrin, Jr., testified at trial to the hyper-technical uses of DNA analysis. He stated that Cellmark's method of DNA identification was accepted throughout the scientific community. Dr. Herrin then informed the jury that the DNA match between the blood recovered from the rear door of the trailer and that of the appellant had a chance or error of only one in 480,000.
Under Rule 4.06 of the Miss.Unif.Crim.R. of Cir.Ct.Prac., the State is required to disclose to the defendant the "[n]ames and addresses of all witnesses in chief proposed to be offered ... at trial... ." Applying the rule to today's case, the prosecution was to disclose the name and address of witnesses Kathy Brock and Dr. George Herrin, Jr., in sufficient advance of trial to allow a reasonable opportunity to interview. Because Rule 4.06 was violated, Jenkins seeks a reversal in this matter. Asserting *1178 harmless error the prosecution contends that appellant suffered no prejudice.
The abuse of our discovery rules is an issue addressed with increasing frequency by this Court. In Justice Robertson's specially concurring opinion in Box v. State, 437 So.2d 19 (Miss. 1983), he enumerated guidelines for evaluating discovery violations under Rule 4.06. Those guidelines, as set out in our recent decision in Traylor v. State, 582 So.2d 1003 (Miss. 1991), provide the following:
1. Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
2. If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
3. If the defendant does request a continuance the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.
Id. at 1006.
Pursuant to the suggestions of Box, which have been followed by this Court, defense counsel requested a continuance after he interviewed Dr. George Herrin, Jr., and Ms. Kathy Brock during the lunch break. Counsel expressed his concern that he was not prepared to meet the expert testimony that would be presented by these witnesses. Contrary to Box, however, the trial court did not either grant a reasonable continuance or ask the State to forego the use of the undisclosed evidence at trial. This was error.
In West v. State, 553 So.2d 8 (Miss. 1989), this Court reviewed a discovery violation where the lower court failed to grant a sufficient delay for defense counsel to prepare for surprise expert testimony. In that case, the prosecution informed the defendant that Dr. Rodrigo Galvez, a board certified pathologist and psychiatrist, would be testifying as an expert in the field of pathology. When Dr. Galvez was examined at trial, however, the district attorney elicited testimony regarding Galvez's expertise in psychiatry. As fate would have it, this testimony, addressing the psychosexual disorder of necrophilia, became a crucial element in the State's theory of the case.
When faced with defense objection, the lower court allowed Dr. Galvez to testify but granted defense counsel, in essence, a one day continuance to prepare for the cross-examination. This Court found that this delay was insufficient. We stated:
Precisely because the prosecution's necrophilia theory was so central to the question whether West could be exposed to the death penalty, a day's break in the action was an inadequate antidote for the prosecution's discovery violation. This is the sort of prosecution theory which, had the defense known of it prior to trial, may well have altered the entire defense strategy. It is the sort of theory which would no doubt have sent the experts scurrying to the books for study and reflection. With all else that must of necessity be juggled in the course of a capital murder trial, unreality attends any suggestion that defense counsel can stop in midstream and become sufficiently informed on a subject like necrophilia to cross-examine with competence.
West, 553 So.2d at 19.
Our ruling in West is instructive in today's case. Appellant informs us that had he known that Dr. George Herrin, Jr., was to testify regarding the DNA testing performed at Cellmark Diagnostics, he would have introduced evidence establishing that Cellmark's procedures have been deemed unreliable for forensic purposes. See State v. Schwartz, 447 N.W.2d 422 (Minn. 1989). Further, appellant asserts that had he been aware of the State's use of this type of evidence, he would have enlisted the aid of an expert for rebuttal purposes. Because Jenkins was denied these possibilities of defense, we find the lower court erred in denying a continuance.
*1179 Turning to the testimony of Ms. Kathy Brock, we believe that our decision in Acevedo v. State, 467 So.2d 220 (Miss. 1985), is closely related in fact and law. In that matter, the defense was provided with reports, pursuant to Rule 4.06, from a weapons expert who was to testify for the State. His reports were inconclusive. Sometime after defendant received this discovery, the expert significantly modified his conclusions, but defense counsel was never notified. At Acevedo's trial, the defendant objected to the varying testimony, claiming surprise at the witness' conclusions. This objection was overruled.
On appeal to this Court, we found that the prosecution had "violated its continuing duty to supplement discoverable material" under Rule 4.06. Further, we ruled that the prosecution's
omission [was] beyond the power of correction by cross-examination, since defense counsel had no notice or opportunity to prepare for an effective cross-examination. Therefore, the trial court erred in overruling Acevedo's objection to Dr. Kinard's trial testimony, which was highly prejudicial to the defense. We must reverse this conviction and remand for a new trial, at which Dr. Kinard's testimony to the same effect will be admissible, but Acevedo will have had the opportunity to muster evidence to the contrary.
Acevedo, 467 So.2d at 224.
Applying Acevedo to our facts, we find that the State initially informed defense counsel that it did not intend to call Kathy Brock at trial. The district attorney clearly stated that he considered Brock's serological reports to be negative to his case. At trial, however, Ms. Brock was called and testified that the blood stains recovered at the scene of the crime were the same blood group type and PGM type as appellant's. This testimony was prejudicial to appellant's defense.
Discovery has been fully discussed by this Court in several opinions, it has been debated by prosecutors and we note that discovery problems seemingly arise with only a few prosecutors. We commend those State prosecutors who willingly and efficiently follow the rule. We note that the percentage of convictions and affirmance by this Court have not been reduced since the rule requiring discovery. The prosecutors who continue to protest discovery by not complying with the rule cost their counties untold thousands of dollars, denigrate excellent police work as in the case sub judice; they cause unnecessary delay in trials, delay in punishment, and in the progress of the case. Discovery has worked to the advantage of all parties including the State. It is time for the few district attorneys to quit trying to prove the rule bad by refusal to comply and recognize that the rule works to the benefit of all. The judicial system requires the support of all. Continued failure by the same district attorneys will not only lead to further cost and delay but to consideration of sanctions from this Court.
We are required to reverse Jenkins' conviction and sentence for a new trial.

V. Instruction S-3

In the guilt phase, the court instructed the jury as follows:
The Court instructs the Jury that if a person enters upon the commission of a crime involving danger to human life, such as robbery, said person is criminally accountable for death caused in the common enterprise. It need not be that the design is to commit the particular crime which is subsequently committed, but there must be a preconcerted plan to do some unlawful act.
Therefore, if you find from the evidence in this case that all of the elements of Capital Murder, as defined in the Court's instructions, have been proved beyond a reasonable doubt, you must find the Defendant WILLIAM WAYNE JENKINS, guilty of the crime of Capital Murder, even though, at the outset, he may not have intended to do the particular thing constituting the crime.
Billy Jenkins asserts on appeal that Instruction S-3 was erroneously given because it informed the jury that they could convict appellant of capital murder even if he did not form the intent to rob until the homicide had occurred. Without a thorough *1180 review of the merits of this claim, we note that Instruction S-3 was, at best, confusing to the jury and, at worst, peremptory in nature. S-3 did nothing to focus the jury's attention upon the issue of Jenkins' intent. Consequently, it merely obfuscated the issue and left the jury shrouded by smoke. Upon retrial, we must recommend that S-3 be revised or deleted from the court's instructions.

PENALTY PHASE

VI. Admissibility of the Sentencing Order

At the penalty phase, the State introduced the Sentencing Order from appellant's June 10, 1988, grand larceny conviction to establish that Billy Jenkins was under a "sentence of imprisonment" when he murdered Dawn Jones. The Sentencing Order established that: (1) Billy Jenkins pled guilty to a charge of grand larceny and was sentenced to a term of five years in the custody of the Mississippi Department of Corrections; (2) Billy Jenkins' sentence was suspended so long as certain conditions of good behavior were met by appellant; and (3) Billy Jenkins was ordered to pay fines and restitution of more than $3,100.00 within a six month period.
After the Sentencing Order was admitted below, defense counsel moved to exclude the provisions of the Sentencing Order that pertained to the appellant's suspended sentence as well as the fines and restitution to be paid by Billy Jenkins. The lower court reviewed the complaints of counsel and determined that the provisions of the order regarding the fines to be paid by Jenkins should be stricken from the document. The court did not, however, exclude the provisions of the order addressing the conditions of appellant's suspended sentence. This ruling, according to Billy Jenkins, constitutes reversible error on appeal because the conditions of his suspended sentence were irrelevant and prejudicial at trial. Upon a review of the proceedings below, however, we must disagree.
The admission of the June 10, 1988 Sentencing Order was an efficient way to prove that Billy Jenkins was under a "sentence of imprisonment" at the time of the offense. The inclusion of the conditions of appellant's suspended sentence was a matter within the discretion of the trial court under Rule 403 of the Mississippi Rules of Evidence. That Rule provides that
[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Although we might disagree with the trial judge concerning the probative value of the conditions of appellant's suspended sentence, in today's case, the ruling of the lower court was not reversible error. Therefore, we find that this assignment of error is without merit.

VII. Instruction C-1-S-A

Billy Jenkins asserts on appeal that Instruction C-1-S-A was erroneously given because it improperly instructed the jury to consider aggravating circumstances outside of the scope of Miss. Code Ann. § 99-19-101 (Supp. 1990). Without addressing the merits of appellant's claim, we simply note that Instruction C-1-S-A, as given by the lower court, was erroneous.
Instruction C-1-S-A was a comprehensive instruction given to guide the jury in their decision at the penalty phase. The final pages of C-1-S-A contained the options available to the jury regarding the form of their verdict. Page three contained the first option, the form of the verdict for the death penalty, and concluded with a line designated for the foreman's signature. Page four contained Option Two, the form of the verdict for life imprisonment, and Three, the verdict if a unanimous decision could not be reached, but provided no spaces for the foreman's signature. We are concerned that the instruction as written and printed could cause the jury to neglect Options Two and Three. Upon retrial, we suggest that the trial court revise this instruction to more clearly instruct the jury.

*1181 VIII. Mercy Instruction

Billy Jenkins asserts that he was entitled to a mercy instruction in the court below and that the failure to give such an instruction resulted in reversible error. We do not agree.
The recent decisions of this Court and of the United States Supreme Court enumerate that a mercy instruction is not required at trial. In Ladner, we held that a defendant "has no right to a mercy instruction." Ladner, 584 So.2d at 761. In Saffle v. Parks, 494 U.S. 484, 492-93, 110 S.Ct. 1257, 1262-63, 108 L.Ed.2d 415, 427-28 (1990), the U.S. Supreme Court stated that the giving of a mercy instruction results in a decision based upon whim and caprice. Thus, the lower court was within its discretion when it denied the mercy instruction below.
This assignment of error lacks merit.

IX. "Especially Heinous, Atrocious, or Cruel" Instruction

The "especially heinous, atrocious, or cruel" instruction given below, Instruction C-4-S, consisted of three distinct limiting instructions that have been subject to various rulings concerning their validity. Part one of Instruction C-4-S provided as follows:
The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
This portion of the limiting instruction is taken from the Fifth Circuit Court of Appeal's decision in Spinkellink v. Wainwright, 578 F.2d 582, 611 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). The instruction was recently deemed inadequate, however, in the U.S. Supreme Court decision of Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). In Shell, the high Court reviewed the use of the above instruction and in a per curiam decision found that "[a]lthough the trial court in this case used a limiting instruction to define the `especially heinous, atrocious, or cruel' factor, that instruction is not constitutionally sufficient." Shell, 498 U.S. at 1, 111 S.Ct. at 313, 112 L.Ed.2d at 4. In short, the Shell Court found that part one of our limiting instruction was insufficient to adequately channel the jury's discretion. The issue then becomes whether the further language of the limiting instruction sufficiently narrowed the aggravating factor. We believe it did.
Part two of Instruction C-4-S provided that:
An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders  the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
This language was approved by this Court in Coleman v. State, 378 So.2d 640, 648 (Miss. 1979); Evans v. State, 422 So.2d 737, 743 (Miss. 1982) cert. denied, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983); and Pinkney v. State, 538 So.2d 329, 357 (Miss. 1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990). The language was also approved by the U.S. Supreme Court in the recent case of Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). In Clemons, the Supreme Court reviewed our finding that the above limiting instruction was proper.
The final portion of Instruction C-4-S contained the language suggested by this Court in Pinkney. In Pinkney, we expressed the desire to see that "our capital sentencing juries ... be more specifically instructed on the meaning of `especially heinous, atrocious or cruel.'" Pinkney, 538 So.2d at 357. We provided the following:
In Evans v. State, 422 So.2d 737, 743 (Miss. 1982), we held that the jury could consider "mental torture and aggravation which the victim probably underwent" in order to determine whether or not the murder was "especially heinous, atrocious or cruel." We noted also that barbarity sufficient to satisfy this aggravating *1182 circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or torturous death was suffered by the victim.
Pinkney, 538 So.2d at 357 (emphasis added).
When Pinkney's appeal was reviewed by the U.S. Supreme Court, the high Court vacated Pinkney's conviction and remanded the case for considerations consistent with Clemons. Thus, the language employed in Pinkney, and in part three of our limiting instruction, was not addressed by the Supreme Court. The language was, however, recently cited with approval in our decision in Hansen. As a result, the language in part three of Instruction C-4-S remains a viable definition of the "especially heinous" factor.
On balance, we believe that Instruction C-4-S was a proper limiting instruction for the "especially heinous, atrocious, and cruel" aggravator. Shell, determined that part one of Instruction C-4-S, when given alone, was constitutionally insufficient. The Court did not find, however, that the instruction was erroneous or whether supplemental instructions could cure the deficiency. In today's case the inadequate Shell instruction is reinforced by the constitutionally valid language from Clemons and the unrejected language from Pinkney. Thus, when the instruction is read as a whole, see Anderson v. State, 381 So.2d 1019, 1024 (Miss. 1980), the "especially heinous" aggravating circumstance was properly narrowed for the jury's consideration.

X. Pecuniary Gain

Billy Jenkins correctly asserts that the lower court was in error when it allowed the jury to consider the aggravating factors of "murder committed while in the commission of a robbery" and "murder committed for pecuniary gain" as two separate and distinct aggravators. In the recent decision of Ladner, we stated that the trial court must conduct a "close scrutiny" of the facts supporting the robbery and pecuniary gain aggravating circumstances. The Court ruled:
In practically every case, where there is a robbery/capital murder, two aggravating circumstances used are the homicide was committed while: (1) engaged in robbery and (2) for pecuniary gain. Our Court should closely scrutinize these two aggravating circumstances in the future, and omit using pecuniary gain, except in clearly, applicable circumstances. One aggravating circumstance is sufficient.
Therefore, we hold, and state to trial judges and prosecutors that, where the indictment charges a robbery/murder capital offense and robbery is designated as an aggravating circumstance, pecuniary gain should not be used as an aggravating circumstance unless clearly supported by the evidence. For instance, A pays B $1,000 to kill C, who has a wallet full of money. B robs C and kills him. There are two aggravating circumstances, i.e. robbery and pecuniary gain.
Ladner, 584 So.2d at 763.
In our decision in Willie, we clearly rejected the use of the robbery and pecuniary gain aggravators finding that they were, in essence, just one. Justice Sullivan, writing for the court, enumerated as follows:
In Ladner, we observed that in a particular case the evidence may be such that the aggravating circumstances of robbery and pecuniary gain are both clearly supported by the evidence. In the absence of such a case, we held that the pecuniary gain aggravator should not be given. Ladner, 584 So.2d 743.
Today, we go one step further. Not only should the two aggravators not be given as separate and independent aggravators when they essentially comprise one, they may not be given. When life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind underlying felony as separate aggravators.
Willie, 585 So.2d at 680-81 (citations omitted).
Based upon our most recent decisions (some decided after the trial of this case), *1183 the lower court was indeed in error when it instructed the jury on both the robbery and pecuniary gain aggravating factors. This Court has established that it does not have the authority to reweigh remaining aggravating circumstances when one or more are found to be invalid. Clemons v. State, 593 So.2d 1004 (Miss. 1992). See also Shell v. State, 595 So.2d 1323 (Miss. 1992).

XI. Victim Characteristics Evidence

During the various arguments of the district attorney, the jury learned that: (1) Dawn Jones was twenty-six years old; (2) Ms. Jones had a seven year-old son from a previous marriage; (3) Dawn Jones had been married to Leroy Jones for four years; and (4) Ms. Jones was very shy and did not like to wear dresses because they exposed her legs. These characteristics, according to appellant, constitute improper argument under the U.S. Supreme Court's decisions in South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) and Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Under the recent expressions of both this Court and the U.S. Supreme Court, we disagree.
Victim impact evidence was the focus of the recent U.S. Supreme Court decision in Payne v. Tennessee, ___ U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In that case, the high Court reviewed an appeal where the defendant was convicted of two counts of first degree murder and one count of assault with intent to commit first degree murder for the brutal stabbing of a mother and her two children. Framing the issue before the Court, Chief Justice Rehnquist stated that: "[i]n this case we reconsider our holdings in Booth v. Maryland, ... and South Carolina v. Gathers, ... that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial." Payne, ___ U.S. at ___, 111 S.Ct. at 2601, 115 L.Ed.2d at 726. In overruling the decisions in both Booth and Gathers, the U.S. Supreme Court provided as follows:
We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.
Payne, ___ U.S. at ___, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.
Victim impact evidence was addressed by this Court in our recent decision in Hansen. In that case, we reviewed the defendant's claim that his trial was impermissibly prejudiced by the jury's knowledge that the victim was a law enforcement officer. In determining that the information was properly before the jury, the Court noted that the victim impact evidence was relevant to the crime charged, thus, not reversible error under our pre or post Payne jurisprudence. Hansen, 592 So.2d at 146-57.
In today's appeal, the evidence complained of was also relevant to issues in the case. Jenkins, in his confession, had claimed a relationship with Ms. Jones. No evidence was admitted to inflame the jury regarding the worth of the victim's life. Moreover, the State did not attempt to establish the impact of the victim's death upon her family. The evidence offered was proper and necessary to a development of the case and true characteristics of the victim and could not serve in any way to incite the jury. In light of the recent decisions in Payne and Hansen, we find no error on appeal.

XII. Cumulative Effect of Trial Errors

If reversal were not mandated by the State's discovery violations, we would reverse this matter based upon the accumulated errors of the prosecution.
This Court has often ruled that errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal. In Griffin v. State, 557 So.2d 542 (Miss. 1990), this Court reviewed an appeal where the defendant claimed that he was denied a fair trial due to the many instances of prosecutorial misconduct. *1184 In reversing Griffin's conviction, this Court held:
Without detailing each and every one of these asserted improper prosecutorial acts, this Court holds that, as a whole, this defendant was not afforded a fundamentally fair trial. The one error of commenting on the defendant's failure to testify requires reversal of the entire case. However, even without that one reversible error, this Court is compelled to say that the cumulative effect of all of these assigned actions would require reversal. Stringer v. State, 500 So.2d 928, 939 (Miss. 1986); Hickson v. State, 472 So.2d 379, 385-86 (Miss. 1985); Barnes v. State, 460 So.2d 126, 135 (Miss. 1984); Williams v. State, 445 So.2d 798, 810 (Miss. 1984); Collins v. State, 408 So.2d 1376, 1380 (Miss. 1982); Russell v. State, 185 Miss. 464, 469, 189 So. 90, 91 (1939).
It is regrettable that the final disposition of this matter must be again delayed, and it is regrettable that the State and County must be put to the additional expense of a new trial, but this accused and any person charged with a crime, under the Constitution of this State, is entitled to be tried in a proceeding which is conducted by the prosecutor with dignity and propriety, free from name-calling, gratuitous insult and unnecessary inflammatory comment, repeated expressions of outrage, frequently recurring and transparent appeals to the emotions of jurors, and other such unacceptable conduct which this Court has repeatedly condemned. This Court cannot close its eyes to prosecutorial misconduct, condone it when it occurs, nor tolerate further recurrence.
Griffin, 557 So.2d at 553.
We note that District Attorney Robert Williams was responsible for the prosecution of Gary Lynn Griffin. As in Griffin, the prosecution's errors today were too numerous and too frequent. Indeed, the district attorney argued at a motion hearing that he would not be held to the standard in Griffin, and while we commend the trial judge on his temperance, a district attorney should not be allowed to announce to the trial judge his intention to ignore case law without the trial judge's admonition. We are compelled to commend the trial judge for his diligence in attempting to give Billy Jenkins a fair trial. The numerous errors committed by the State, however, cannot stand in the wake of our Griffin decision. Therefore, had reversible error not been committed at the guilt phase, we would be required to reverse based upon the numerous instances of prosecutorial misconduct.
The conviction of Jenkins of the crime of capital murder and the sentence of death imposed thereupon are vacated and reversed and this case is remanded for a new trial consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, BANKS and McRAE, JJ., concur.