# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-01573-COA

**JAMIE DANIELLE CARPENTER A/K/A JAMIE CARPENTER**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/24/2012 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | MICHAEL W. CROSBY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF FELONY CHILD ABUSE AND SENTENCED TO TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 07/26/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON AND FAIR, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.     Between June 11 and 12, 2010, thirteen-month-old C.W.[1] sustained life-threatening injuries consistent with child abuse.  The only two adults who had access to C.W. during the relevant time period were his mother and his mother's boyfriend—Jamie Carpenter and

_____

        [1] Due to the sensitive nature of this case, we substitute initials for the name of the child to protect the child's identity.

Thomas Lindhurst, respectively.[2]

¶2.    Carpenter was convicted in the Circuit Court of Harrison County, Mississippi, of felony child abuse and was sentenced to twenty years in the custody of the Mississippi Department of Corrections (MDOC).  On appeal, Carpenter asserts: (1) prosecutorial misconduct; (2) the trial court erred by excluding witness testimony; (3) the trial court erred by denying her motions for a directed verdict and a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial; and (4) cumulative error.  Finding no error, we affirm.

**FACTS**

¶3.    On June 11, 2010, at 9:15 p.m.—while Lindhurst was at work—Carpenter put C.W. and her other child to bed.  According to Carpenter, C.W. appeared to be fine.   Carpenter then prepared a romantic dinner for Lindhurst with a card, flowers, and wine.

¶4.    Lindhurst testified that when he got home from work, between 11 and 11:30 p.m., Carpenter was in the shower.  When Carpenter got out of the shower, she and Lindhurst had an argument because Lindhurst was not appreciative of what Carpenter had done.  However, they decided to make up and have a glass of wine.  According to Carpenter, Lindhurst was not talking to her and was sitting on the other couch, so she decided to go to sleep.

¶5.    William "Willie" Davis testified that at 12:15 a.m., Lindhurst picked him up to go to Treasure Bay Casino.  Davis also testified that while they were at Treasure Bay Casino,

_____

[2] Carpenter and Lindhurst lived together in a two-bedroom, one-bathroom apartment.

Carpenter called Davis's cell phone at around 2:30 a.m.[3] Davis stated that despite Carpenter's insistence, Lindhurst refused to talk to Carpenter. According to Davis, Lindhurst had four to five drinks at Treasure Bay Casino but was not intoxicated and seemed upbeat when they left at around 3:30 a.m.

¶6. Lindhurst testified that when he got home from Treasure Bay Casino, between 3 and 4 a.m., Carpenter was asleep on the couch. According to Carpenter, she woke up at around 3:40 a.m., and Lindhurst was asleep on the other couch.

¶7. Carpenter testified that she woke up again at 7:30 a.m., and Lindhurst was still on the couch. Lindhurst testified that he woke up between 8 and 9 a.m. but went back to sleep. At around 10:30 a.m., Lindhurst woke up again and went to check on C.W.

¶8. Lindhurst found C.W. sitting in his crib with bruises from head to toe. Lindhurst yelled for Carpenter, but Carpenter did not come into the bedroom. Carpenter allegedly thought Lindhurst was referring to injuries that C.W. sustained from crawling and bumping his head. However, Lindhurst testified that when he insisted that Carpenter come to the bedroom, Carpenter said that C.W. had woken up like that, and she thought he had cancer. It is disputed as to who suggested going to the hospital.

¶9. C.W. was admitted to Memorial Hospital at Gulfport on June 12, 2010, at 1:24 p.m. And he was seen immediately thereafter at 1:31 p.m. by Dr. David Eakes—the medical director and attending physician in the emergency department at Memorial Hospital. Dr. Eakes testified that C.W. had multiple bruises, appearing as though he had been struck with

---

[3] Davis stated that Carpenter called his cell phone twice within ten minutes; however, Davis only answered once.

an object. C.W. also had second- and third-degree burns, appearing as though someone held a hot object to the bottoms of his feet; a laceration to his spleen; and a contusion to his lung.[4] Dr. Eakes testified the injuries occurred at least ten to twelve hours before he saw them. Dr. Eakes also testified that it would have been normal for C.W. to sleep until 10:30 a.m. because he was exhausted and dehydrated from screaming and crying. Dr. Eakes stated that C.W. would have cried an hour or two before finally falling asleep.

¶10.    Stephanie Schindler was the on-call medical social worker at Memorial Hospital on June 12, 2010. Carpenter told Schindler that she planned a romantic dinner for Lindhurst, but when Lindhurst came home, they had an argument, and Lindhurst left and went back out with his friends. Carpenter made it clear to Schindler that it was mainly just her at the apartment because Lindhurst was between work and going out with his friends, and that no one else was there.

¶11.    Schindler and Carpenter also discussed Carpenter's recent miscarriage of Lindhurst's child. Schindler testified that it was suggested to Carpenter that she look into counseling "at which point [Carpenter] clearly stated, I actually am having a good day. I feel fine. I feel better today than I have in a long time." Schindler stated that Carpenter's demeanor was flat.[5]  Whereas Lindhurst was completely distraught, started crying, and was visibly

---

[4] C.W. also had a small laceration to his ear. Dr. Eakes testified that it was possible that C.W. obtained this injury by falling out of the bathtub on a prior occasion—consistent with Lindhurst's testimony.

[5] Carpenter testified that she was in shock.

4

emotional.[6]

¶12.    Carpenter also told Schindler that C.W. "woke up that way." Schindler talked with the medical staff at the hospital, and it was determined that C.W. did not just "wake up that way." As a result, Schindler notified the Mississippi Department of Human Services (DHS) and law enforcement.

¶13.    Officer Robert Brown of the Gulfport Police Department was dispatched to Memorial Hospital. Carpenter told Officer Brown that she was the only adult who had access to C.W. that night. Carpenter acknowledged that she told law enforcement she would have heard screaming if Lindhurst was abusing C.W. She also told Officer Brown that she thought C.W.'s injuries were a medical disorder. Carpenter admitted to having a Lortab addiction and appeared emotionless and withdrawn. Whereas Lindhurst appeared upset and worried about C.W. Lindhurst told Officer Brown that Carpenter had been depressed leading up to the incident.

¶14.    Officer Christopher Keckler of the Gulfport Police Department also responded to Memorial Hospital. Officer Keckler testified that Carpenter appeared unconcerned, unworried, and nonchalant. And Carpenter was more concerned about the argument she and Lindhurst had the previous night. Officer Keckler also stated that Lindhurst was upset, crying, and very concerned.

¶15.    Lindhurst testified that Carpenter stated "there is no way to prove if somebody beat

_____

[6] Carpenter testified that Lindhurst was worried he would get in trouble. However, Lindhurst testified that he was only worried because Carpenter and her family threatened to press charges against him.

5

up a kid because nobody saw it . . . ." However, Carpenter denied making this statement.

¶16. C.W. was later transferred to the pediatric intensive-care unit at Tulane University Hospital and Clinic.

## PROCEDURAL HISTORY

¶17. Prior to trial, the State moved to exclude the testimony of two witnesses—Alisha Aven[7] and Kathryn Bailey. Aven and Bailey planned to testify that several days after the incident, Lindhurst said he was "sick of looking at that baby's [(i.e., C.W.'s)] s***" and threw away C.W.'s high chair. The State also moved to exclude the testimony of Timothy Carpenter, who planned to testify that Lindhurst said it was unfair that C.W. lived while his own baby had died. The trial court ruled that the proposed testimony was irrelevant and therefore inadmissible under Mississippi Rule of Evidence 402. The trial court further ruled that even if the proposed testimony was relevant, it was inadmissible under Mississippi Rule of Evidence 403. Additionally, the trial court found that the testimony constituted inadmissible hearsay.

¶18. On May 10, 2012, Carpenter was convicted of felony child abuse. And on May 24, 2012, Carpenter was sentenced to twenty years in the custody of MDOC.

¶19. Two years later, in August 2014, Carpenter filed a petition for postconviction relief (PCR). And on September 30, 2014, Carpenter filed a motion for a JNOV or, in the alternative, a new trial.

¶20. On October 3, 2014, the trial court granted Carpenter leave to file an out-of-time

---

[7] Alisha is referred to as Alisha Aaron by the State, Alisha Avan in the transcript, and Alisha Aven in other parts of the record. We will use the spelling "Aven."

appeal and denied all remaining allegations in her PCR petition.

¶21. On November 3, 2014, Carpenter filed a notice of appeal. However, the appeal could not proceed because of the outstanding motion for a JNOV or, in the alternative, a new trial. On December 9, 2014, the trial court denied Carpenter's motion for a JNOV or, in the alternative, a new trial as untimely. Carpenter appeals.

## DISCUSSION

### I.     Prosecutorial Misconduct

¶22. In her first issue, Carpenter claims that the prosecutors engaged in prosecutorial misconduct. Specifically, she takes issue with various comments made by the State during its closing arguments.

### A.     Emotional State

¶23. Carpenter claims the prosecutors' comments with respect to her statement that she was "having a good day" were misleading and taken out of context. Specifically, Carpenter claims that her statement was in response to a discussion about her miscarriage—not C.W.'s injuries.

¶24. At trial, Schindler testified as follows:

> Q:     . . . Did you discuss with [Carpenter] this miscarriage and other issues?
>
> A:     Yes. It was suggested to [Carpenter] that she look into counseling, at which point [Carpenter] clearly stated, ["]I actually am having a good day. I feel fine. I feel better today than I have in a long time.["] I had just told [Carpenter that] her son's spleen was lacerated.

¶25. Carpenter provided the following clarification:

> Q:     Now, you heard Miss Schindler say that she asked you how you were

doing, and she said that you responded, ["]I feel great today.["] Were those the words you used, and explain to us what you were referring to?

A: What I actually said, she advised me that I might need counseling because of the miscarriage and I told her that I actually - -

SIMPSON:[8] Your Honor, again it is hearsay about what another witness was saying.

COURT: Sustained.

Q: What did you say to [Schindler] after whatever it was she said?

A: I told her that I had been feeling better the last few days.

Q: From the miscarriage?

A: Yes, sir.

¶26. Carpenter claims the prosecutors made the following improper comments during closing arguments:

PARKER:[9] Then [Carpenter] is informed that [C.W.] has a lacerated spleen, a bruised lung, his burns are second and third degree, and that they have to take him to Tulane. They find out about [Carpenter's] miscarriage. They come up to [Carpenter] and they say, can we get you counseling, what can we do, what can we do to help. How does [Carpenter] respond? How does [Carpenter] respond? I'm actually having a good day.

. . . .

SIMPSON: I can't tell you what kind of mother would be told that her child is about to be transferred to a pediatric intensive care unit because his injuries are life threatening, and [Carpenter] has the gall to tell the social worker offering her help, this is one of the best days I've had in a while. Are you kidding me.

---

[8] Prosecutor for the State.

[9] Prosecutor for the State.

¶27. Carpenter's counsel did not object to either comment at trial. "'A contemporaneous objection must be made . . . for this Court to consider claims of improper or erroneous comments' by a prosecutor during arguments, or the objection is waived." *Graham v. State*, 120 So. 3d 1038, 1042 (¶20) (Miss. Ct. App. 2013) (quoting *Hampton v. State*, 815 So. 2d 429, 432 (¶11) (Miss. Ct. App. 2002)). "Although, if a comment is so inflammatory that the trial court should have objected on its own motion, the point may be considered." *Id.* (citation and quotation marks omitted). Following this standard, we do not find that the prosecutors' comments require us to reverse the conviction. *See id.* This issue is without merit.

### B. Dr. Eakes's Testimony

¶28. Carpenter also claims that the prosecutors' comments that C.W.'s burns occurred ten to twelve hours before Dr. Eakes saw them were improper because Dr. Eakes testified that the burns occurred *at least* ten to twelve hours before he saw them. Further, Carpenter claims Dr. Eakes did not establish the time from which he was calculating—when he saw the burns or when the photos of the burns were taken.

¶29. At trial, Dr. Eakes testified as follows:

> Q: Okay. So is it your opinion within a reasonable medical probability, Dr. Eakes, that the burn on [C.W.'s] foot as illustrated here in State's Exhibit 2 occurred at least ten to twelve hours before you saw it?
>
> A: That is my opinion.

¶30. Carpenter claims the prosecutors made the following improper comments during closing arguments:

9

PARKER:  Remember Dr. Eakes. He tells you that in his medical expert opinion these burns tell you that she did it ten to twelve hours before he examined [C.W.] You know he examined [C.W.] at approximately 1:10 the next day. If you count back ten to twelve hours, when did she do this? Between [1:00] and 3:00 in the morning. Who was the only one there? This defendant.

. . . .

SIMPSON:  Remember Dr. Eakes, he said he saw [C.W.] right away . . . . He told you why this burn was done about ten to twelve hours before he examined [C.W.]

¶31.  Again, Carpenter's counsel did not object to either comment; therefore, the objection was waived. *Id.* However, as stated, "if a comment is so inflammatory that the trial court should have objected on its own motion, the point may be considered." *Id.* (quoting *Hampton*, 815 So. 2d at 432 (¶11)). Following this standard, we do not find that the prosecutors' comments require us to reverse the conviction. *See id.* This issue is without merit.

## II. Exclusion of Testimony

¶32.  In her second issue, Carpenter claims the trial court erred by excluding the testimony of "several of the defense witnesses." As stated, Aven and Bailey planned to testify that several days after the incident, Lindhurst said he was "sick of looking at that baby's [(i.e., C.W.'s)] s***'" and threw away C.W.'s high chair. Carpenter also planned to testify that Lindhurst said it was unfair that C.W. lived while his own baby had died.

¶33.  "The standard of review for both the admission or exclusion of evidence is abuse of discretion." *Bradley v. State*, 921 So. 2d 385, 388 (¶6) (Miss. Ct. App. 2005) (citing *Harrison v. McMillian*, 828 So. 2d 756, 765 (¶27) (Miss. 2002)).

¶34.   On appeal, Carpenter does not challenge the trial court's finding that the statements constituted inadmissible hearsay.  Furthermore, we do not find that the trial court abused its discretion in excluding the testimony of Aven, Bailey, and Carpenter under Mississippi Rule of Evidence 403.  The probative value, if any, of Lindhurst's alleged statements and act of throwing away C.W.'s high chair was substantially outweighed by the risk of confusing the jury.  This issue is without merit.

### III.   Weight and Sufficiency of the Evidence

¶35.   In her third issue, Carpenter claims the trial court erred by denying her motion for a directed verdict and her motion for a JNOV or, in the alternative, a new trial.

¶36.   If a motion for a directed verdict is denied and the defendant introduces evidence on her own behalf, the defendant must renew her motion for a directed verdict at the close of all evidence in order to preserve the issue for appeal.  *Page v. State*, 990 So. 2d 760, 762 (¶¶9-10) (Miss. 2008).  Carpenter moved for a directed verdict at the close of the State's case-in-chief; however, Carpenter failed to renew her motion for a directed verdict at the close of all evidence.

¶37.   Furthermore, a motion for a new trial must be made within ten days of the judgment, and in the case of a motion for a JNOV, within ten days or by the end of the term of court. *See* URCCC 10.05; *see also Ross v. State*, 16 So. 3d 47, 52 (¶6) (Miss. Ct. App. 2009). Carpenter filed her motion for a JNOV or, in the alternative, a new trial more than two years after the judgment.

¶38.   For these reasons, this issue is procedurally barred.

11

### IV. Cumulative Error

¶39. In her final issue, Carpenter claims that the cumulative effect of all the errors committed during trial, even if not reversible in themselves, combine to make up reversible error.

¶40. "[E]rrors in the lower court that do not require reversal standing alone may nonetheless[,] taken cumulatively[,] require reversal." *Conley v. State*, 790 So. 2d 773, 807 (¶141) (Miss. 2001) (quoting *Jenkins v. State*, 607 So. 2d 1171, 1183 (Miss. 1992)). "However, 'where there was no reversible error in any part, . . . there is no reversible error to the whole.'" *Id.* (citation omitted). Because we find no error, this issue is without merit.

¶41. **THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY, FIRST JUDICIAL DISTRICT, OF CONVICTION OF FELONY CHILD ABUSE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR**.