## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 97-DP-01459-SCT

*CURTIS GIOVANNI FLOWERS*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 10/17/1997 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES W. CRAIG |
| | F. KEITH BALL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE LEE |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED -12/21/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/28/2000 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is denied. The original opinions are withdrawn, and these opinions substituted therefor.

¶2. This case comes to this Court on appeal by Curtis Giovanni Flowers from the Circuit Court of Montgomery County where Flowers was indicted for the capital murder of Bertha Tardy while engaged in the commission of the felony crime of armed robbery, in violation of Miss. Code Ann. §§ 97-3-19(2)(e) (Supp. 1996) and § 97-3-79 (1994). Flowers was also indicted separately for three other capital murders which occurred at the same time.

¶3. A change of venue was granted to Lee County, and, after hearing all of the testimony and evidence, the jury convicted Flowers of capital murder. The sentencing phase was then conducted, and the jury imposed the death penalty. Flowers's Motion for Judgment of Acquittal Notwithstanding the Verdict of the Jury, or in the Alternative, for a New Trial was denied, and he filed a notice of appeal to this Court. The execution of the death sentence was stayed pending appeal.

## STATEMENT OF THE FACTS

¶4. On the morning of July 16, 1996, Sam Jones, Jr., a retired employee of Tardy Furniture Company (Tardy's) in Winona, Mississippi, received a telephone call from the owner, Bertha Tardy. She asked Jones to come to the furniture store to train her newest employees, Robert Golden and Derrick Stewart, on how to load and unload furniture. Upon arrival at the store at approximately 9:45 a.m., Jones discovered the bodies of Tardy and three other victims. Jones ran to a nearby business and asked an employee to call the police and an ambulance.

¶5. After his initial entry onto the crime scene, Johnny Hargrove, Chief of Police in Winona, called for backup. MedStat, the coroner, the District Attorney, the Mississippi Highway Patrol and the Mississippi Crime Lab were all requested for their services. During the investigation it was determined that the gunshot wound that killed Tardy was consistent with a .380 caliber pistol. Doyle Simpson, a relative of Flowers, had a .380 pistol stolen from his car the day of the murders. Flowers was questioned on the afternoon of the murders and consented to a gunshot residue test, but was not detained at that time. He later moved to Texas at the end of September. After further investigation had been completed, Flowers was arrested and brought back to Mississippi. The State elected to indict Flowers separately on a charge of capital murder of all four victims. The circuit court judge denied Flowers's motion to consolidate these four causes. Tardy's murder was tried independently of the others.

¶6. After a change of venue was granted, the trial commenced on October 13, 1997, in Lee County. The State called more than twenty witnesses to testify during its case in chief. Johnny Hargrove was the state's first witness. Hargrove testified and identified photographs showing bloody footprints that were obtained from the crime scene. Investigators were later able to determine that the footprints were consistent with a Fila Grant Hill, size ten and a half tennis shoe, the same size as worn by Flowers.

¶7. Melissa Schoene, a certified crime scene analyst with the Mississippi Crime Lab, testified that the evidence she discovered in Tardy's on the day of the murders included five separate casings from a .380 caliber firearm. Investigators later found .380 caliber projectiles left in a post that had been used for target practice by Doyle Simpson.

¶8. Doyle Simpson, a relative of Flowers, testified that on the day of the murder he had gone to work at Angelica's at about 6:15 a.m. Testimony at trial revealed that his .380 caliber pistol was stolen out of Simpson's car on the morning of the murders. Witnesses testified that they saw Flowers walking in the direction of Angelica's around 7:15 a.m. and saw him leaning against Simpson's car that same morning between 7:00 and 7:30 a.m. Investigators determined that one projectile, which was recovered from a mattress at the scene, was found to have been fired from the same .380 caliber firearm that belonged to Doyle Simpson. The other projectiles that were recovered bore similar class characteristics to all of the projectiles such that the crime laboratory stated that they could have originated from the .380 or a similar gun.

¶9. Jack Matthews, an investigator with the Mississippi Highway Patrol, testified that Flowers was questioned initially as a witness, because he had worked at Tardy's since June 29. During the questioning, Flowers told the investigator that on July 3, Tardy had asked Flowers to pick up some batteries from a business in Winona. The batteries had fallen out of the truck and had been damaged, and Tardy had informed Flowers that he would have to pay for the batteries which amounted to between $ 300 and $ 500. Flowers did not report back to work after this incident, and the last conversation he had with Tardy was on

July 9, when she told him he did not have a job anymore. According to Flowers's testimony, Tardy had advanced him $30 on July 3, but would not give him the rest of his money since it was used to pay for the damaged batteries.

¶10. Investigator Matthews was also allowed to testify, over the defense's objections, about the contents of a ledger sheet found in a drawer at Tardy's. The ledger indicated that approximately $287 was found to be missing from the cash drawer on the morning of the murders. Later $ 255 was discovered in the home of Connie Moore-Flowers's girlfriend where he was living the day Tardy was murdered.

¶11. Matthews further testified that a gunshot residue test that had been administered on Flowers was positive. Defense witnesses testified that a few days before the murders Flowers had been shooting fireworks from his hands, and Flowers testified that he had been working on a battery in his truck a few days prior to the murders. However, the forensic scientist who analyzed the gunshot residue test conducted on Flowers testified that the residue found on Flowers was from particles that contained positive identification for "gunshot residue to the exclusion of all other environmental sources."

¶12. Roxanne Ballard, Tardy's daughter, testified as to the normal operating procedures of the store and stated that she was involved to some extent in the business. She identified a payroll check made out to Flowers in the amount of $89.58, for 17 hours and 55 minutes of work at $5.00 an hour. She also identified an advance paid to Flowers in the amount of $30.

¶13. The State called numerous witnesses who testified they saw Flowers on the day of the murders. Patricia Hollman testified that she saw Flowers several times that morning and that he was wearing black nylon sweat pants and Fila Grant Hill tennis shoes. Over the defense's objections, Hollman was allowed to state that she had heard Flowers and his girlfriend arguing three days before the crimes were committed. When asked what the substance of the argument was, Hollman stated that in her opinion the couple was arguing about Flowers's work. The defense objected to this opinion statement as to leading the witness, and the court sustained the objection. The judge allowed the statement that supported the fact that the witness heard the defendant arguing, but her opinion that the argument was about work was not allowed. The jury was instructed to disregard the testimony concerning the witness's opinion.

¶14. In addition to this above evidence, two men, Veal and Hawkins, who shared a cell with Flowers in the Leflore County Jail, testified that Flowers admitted to them that he had committed the murders. Flowers also allegedly admitted to Veal that he had taken money out of the store.

¶15. After the State's case-in-chief, the defense moved for a directed verdict, and the motion was overruled. Roy Harris testified for the defense and stated that on the day of the murders he had picked up Clemmie Fleming in order to give her a ride downtown to pay her furniture bill at Tardy's. He testified that before they got to Tardy's, Fleming asked him to first take her to her mother's house. Harris stated that before they reached the furniture store he turned on a side street, which was about two blocks from Tardy's, where they saw a man run across the road. He stated that Fleming indicated that she knew the man to be Curtis Flowers. Fleming, who had earlier testified for the State, said that it was approximately 10:00 a.m. when she saw this man.

¶16. Flowers's girlfriend, Connie Moore, testified that the police removed a Grant Hill Fila shoe box from her house and that the box was for a size 10½ Grant Hill Fila tennis shoe. She also testified that she had purchased a pair of Fila tennis shoes, size 10½, for her son, Marcus, around November of 1995. She

further testified that her son had gone to live with his father in January of 1996 and she thought that he had taken the shoes with him. She also stated that she had not seen those shoes in her house any time after the day of the murders. Moore stated that Flowers was at her house when she left to go to work on the morning of the murders. At trial it was established that at the time of the murders Flowers was the only person living with Moore who wore a size 10 ½ tennis shoe.

¶17. Flowers testified on his own behalf. He testified that he started working at Tardy's sometime before the fourth of July. He further testified that he had been told by Tardy that any damages caused by him were to come out of his check. He stated that he did in fact pick up some batteries at the request of Tardy and that the batteries had fallen out of the truck he was driving. Flowers told Tardy about this incident, and she asked him to return the batteries. She stated that if they could not work out anything about the damages it would have to come out of Flowers's check. Flowers also testified that he had not received a check for his work, but that Tardy had advanced him $30. Flowers further testified that he did not go back to work for Tardy after July 3, but that he did talk to her on the phone, and she said she had hired someone else and would not need Flowers. Flowers testified that on the morning of the murders he got up around 9:00 a.m. and, while cooking breakfast, cut his hand on a can of shortening. He then went to his sister's house to get a bandage staying there about 15 minutes. Flowers also testified that he wears size 11 gym shoes. He stated that on the day of the murders he had on a pair of cut-off Tommy Hilfiger shorts, a white Hilfiger shirt and blue and white Nike tennis shoes. He further testified that he shot fireworks on the day before the murders and that he had also handled car batteries because he had been working on his truck. He denied leaning on Doyle Simpson's car on the day of the murders, and he denied running near the furniture store around 10:00 a.m. He also denied ever telling cell mates, Veal and Hawkins, that he had committed any crime. On cross-examination, the State elicited that Flowers had given three conflicting statements about the time he actually went to his sister's house on the day of the murders, ranging from 9:15 a.m. to 12:00 noon. He also contradicted the times he had told the investigator that he went to Jeff's store.

¶18. After the defense rested, the State called Wayne Miller, the investigator for the Highway Patrol, for rebuttal testimony. Miller testified that he was present when the gunshot residue test was done on Flowers, but that he did not conduct a test on the defendant, which was in direct conflict with Flowers's previous statement that Miller had done a test first and messed it up so that it had to be done again. On cross-examination, Miller testified that he had to leave the room during the test because of a phone call and was not there for its completion. At this point the State rested, and the case went to the jury. The jury returned a verdict of guilty of capital murder. After the sentencing phase, held the same morning, the jury imposed the death penalty finding two aggravators:

1) The capital offense was committed for pecuniary gain during the course of an armed robbery;

2) The Defendant knowingly created a great risk of death for many persons.

¶19. On November 4, 1997, Flowers's motion for a JNOV or a new trial was denied. He filed a notice of appeal to this Court raising the following issues:

## ISSUES

**I. THE CIRCUIT COURT ERRED, VIOLATING FLOWERS'S RIGHTS UNDER THE FOURTEENTH AMENDMENT, WHEN IT OVERRULED THE DEFENDANT'S *BATSON* MOTION**

**II. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE ADMISSION OF EVIDENCE AND ARGUMENT OF OTHER CRIMES IN VIOLATION OF THE MISSISSIPPI CONSTITUTION, LAW, RULES OF EVIDENCE AND SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**III. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT**

**IV. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE TRIAL COURT'S IMPROPER AND HIGHLY PREJUDICIAL COMMENTS ON THE EVIDENCE BEFORE THE JURY**

**V. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE JURY'S LACK OF KNOWLEDGE REGARDING THE TESTIMONY OF TIMOTHY HAYMORE AND THE TRIAL COURT ERRED EITHER BY EXCLUDING HIM FROM TESTIFYING OR, IN THE ALTERNATIVE, BY REFUSING TO CONTINUE THE TRIAL UNTIL FREDERICK VEAL RETURNED TO COURT**

**VI. FLOWERS WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION**

**VII. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL DUE TO THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT THE ALLEGED PRIOR INCONSISTENT STATEMENTS OF HIS WITNESSES WERE NOT TO BE CONSIDERED AS SUBSTANTIVE EVIDENCE BUT ONLY FOR IMPEACHMENT AND REFUSAL OF INSTRUCTION D-12**

**VIII. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY OVERRULING FLOWERS'S OBJECTIONS TO THE TESTIMONY OF JACK MATTHEWS**

**IX. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING THE CIRCUMSTANTIAL EVIDENCE INSTRUCTIONS OFFERED BY FLOWERS**

**X. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT FLOWERS'S CONVICTION FOR CAPITAL MURDER AND THE VERDICT OF DEATH.**

**XI. THE TRIAL COURT ERRED BY REFUSING INSTRUCTIONS D-11 AND D-14 AND, CONSEQUENTLY, THE JURY WAS INADEQUATELY INSTRUCTED ON THE LAW AS TO CAPITAL MURDER VIOLATING FLOWERS'S RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS.**

**XII. PATRICIA HOLLMAN'S TESTIMONY REGARDING A STATEMENT ALLEGEDLY MADE BY FLOWERS AND HER LAY OPINION AS TO THE MEANING OF THE STATEMENT WAS INADMISSIBLE AND RESULTED IN PREJUDICE REQUIRING REVERSAL.**

**XIII. THE TRIAL COURT ERRED BY OVERRULING FLOWERS' OBJECTION TO EXHIBITS S 15, S 15A, S 17 AND S 17 A AND FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE ADMISSION OF EXHIBITS S 16, S 16A, S 20, S 20A, S 21 AND S 21A.**

**XIV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING THE TESTIMONY OF KHARITA BASKIN.**

**XV. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE ADMISSION OF EVIDENCE AND ARGUMENT OF ANOTHER CRIME DURING THE SENTENCING PHASE.**

**XVI. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT DURING THE SENTENCING PHASE.**

**XVII. FLOWERS WAS DENIED A FAIR AND RELIABLE SENTENCING HEARING DUE TO AN INADEQUATE JURY INSTRUCTION ON THE AGGRAVATING CIRCUMSTANCE OF "PECUNIARY GAIN" AND THE PROSECUTION'S COMMENT THEREON.**

**XVIII. THE SUBMISSION OF THE "ROBBERY-PECUNIARY GAIN" AGGRAVATING FACTOR, AND THE COURT'S REFUSAL OF INSTRUCTIONS DS-7 AND DS-8, VIOLATED THE FIRST AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.**

**XIX. THE CIRCUIT JUDGE VIOLATED MISSISSIPPI LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY INSTRUCTING THE JURY THAT IT COULD CONSIDER THE DEATHS OF THE VICTIMS IN OTHER CASES UNDER INDICTMENT AS AN AGGRAVATING CIRCUMSTANCE, ESPECIALLY WHERE NO COMPETENT EVIDENCE SUPPORTED THIS AGGRAVATING FACTOR.**

**XX. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF THE MATTERS ADDRESSED ABOVE**.

¶20. After a thorough review, we find that the State improperly employed a tactic or trial strategy of trying Flowers for all four murders during this trial for the murder of Tardy alone, which we cannot say did not inflame and prejudice the jury. Evidence of the other crimes was admitted which was not necessary in order for the State to prove its case in chief against Flowers for the murder of Ms. Tardy. We therefore, hold that Flowers did not receive a fair trial, and we reverse and remand for a new trial.

¶21. Additionally, we find that the prosecutor repeatedly asked improper questions not in good faith in which there was no basis, in fact. The prosecutor also improperly argued a supposedly inconsistent statement made by Flowers to law enforcement by admittedly holding up a taped statement which was not in evidence at the time, and in fact was never introduced as evidence to show inconsistencies as alleged or on the particular date claimed by the prosecutor. This potentially became confusing and misleading to the jury, especially when coupled with improper cross-examination of Flowers and an improper comment by

the trial court. We must therefore reverse and remand for a new trial on this issue also. We also note an accumulation of errors which warrant reversal. Because of this Court's reversal for the aforementioned reasons, it is unnecessary to discuss the other assignments of error raised by Flowers.

## LEGAL ANALYSIS

¶22. "This Court's well established standard for reviewing an appeal from a capital murder conviction and a death sentence is one of 'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." *Porter v. State*, 732 So. 2d 899, 902 (Miss. 1999) (citing *Balfour v. State*, 598 So. 2d 731, 739 (Miss.1992) (quoting *Williamson v. State*, 512 So.2d 868, 872 (Miss.1987)). "This Court recognizes that 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Id*.

### II. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE ADMISSION OF EVIDENCE AND ARGUMENT OF OTHER CRIMES IN VIOLATION OF THE MISSISSIPPI CONSTITUTION, LAW, RULES OF EVIDENCE AND SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

¶23. Flowers contends that he was prejudiced by the State's repeated references to the other murder victims and the significant amount of evidence and argument regarding the other victims. He claims that the introduction of evidence of the other murders was a specific violation of Rules 401-404(b) of the Mississippi Rules of Evidence. This Court has adopted the Mississippi Rules of Evidence to establish procedures to guide the admissibility of relevant evidence. *Mackbee v. State*, 575 So. 2d 16, 23-24 (Miss. 1990). This comports with the due process clauses of the Mississippi Constitution and the Federal Constitution, which require that a trial be conducted so that no person shall be deprived of life, liberty, or property except by due process of law. *Id*. at 24. *See also* U.S. Const. amend. XIV; Miss. Const. of 1890, art. 3, § 14. Due process requires that a criminal prosecution should be conducted according to established criminal procedures. 575 So. 2d at 24.

¶24. The Rules require that evidence be relevant, and, if so, it is generally admissible. M.R.E. 401, 402. However, even relevant evidence may not be admissible due to prejudice, confusion, or waste of time. M.R.E. 403. Evidence of other crimes is generally not admissible to show that the party acted in conformity with past behavior, but Rule 404(b) provides an exception as to the admission of other crimes. The comment to Rule 404(b) states in pertinent part:

> (b) . . . Evidence of another crime, for instance, is admissible where the offense in the instant case and in the past offense are so inter-connected as to be considered part of the same transaction. *Neal v. State*, 451 So. 2d 743 (Miss. 1984).

M.R.E. 404(b) cmt.

¶25. Where proof of other crimes or acts of the defendant is offered into evidence pursuant to Rule 404(b), it is still subjected to the requirement that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. M.R.E. 403. Rule 403 is the "ultimate filter through which all otherwise admissible evidence must pass." *Bounds v. State*, 688 So. 2d 1362, 1370 (Miss. 1997). The defense recognizes that there are exceptions to the rule, but argues that the State in the case sub judice

"engaged in tactical overkill" in continually referring to the other three killings when the same was unnecessary, because Flowers was only being tried for the murder of Tardy.

### Evidence And Argument Regarding "Other Victims"

¶26. The State elected to indict Flowers separately for the four murders. Then, the State contested Flowers's motion to consolidate the four murders indictments into one trial which was denied by the trial judge. Subsequently, during trial, there were repeated occurrences of the introduction of evidence of the other three murders.

¶27. During the opening statement, the prosecutor stated that four people were working at Tardy's on the day of the murder and that when Sam Jones came in to work he found all four people "laying in the floor shot, laying in pools of blood." The State named the people who were working that morning and stated that two of the victims had just started working for Tardy. It was also pointed out that when the police chief arrived, "he determined that everybody there was dead except for Derrick Stewart . . ." and that "Derrick lived for a while, for days before he finally died from a gunshot wound to the head." Counsel continued by stating that the other three people were killed from gunshot wounds to the head. These references continued throughout the trial with comparisons by testimony and exhibits showing placement of the bodies, the fact that four people had been killed, and how they died.

¶28. In applying Rule 404(b), this Court has held that even though it may reveal other crimes, evidence or testimony may be given in order to tell a rational and coherent story of what happened and where it is substantially necessary to present a complete story. *Mackbee v. State*, 575 So. 2d 16, 27-28 (Miss. 1990) (citing *Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986)). Such evidence of the other crime is also admissible if it sheds light upon the motive or if it forms a part of a chain of facts intimately connected so that in order to interpret its general parts, the whole must be heard. *Davis v. State*, 530 So. 2d 694, 697-98 (Miss. 1988). This rule has also applied when the evidence is integrally related in time, place, and fact to the crime for which the defendant is being tried in order to allow the State to tell a coherent story of what happened to the victim. *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987). *See also Ladner v. State*, 584 So.2d 743, 758 (Miss. 1991); *Wheeler v. State*, 536 So. 2d 1347, 1352 (Miss. 1988). Evidence has been admitted where the other offense formed a single transaction or closely related series of transactions in relation to the crime charged. *Robinson v. State*, 497 So. 2d 440, 442 (Miss. 1986). *See also Davis v. State*, 476 So. 2d 608, 609 (Miss. 1985). Rule 404(b) is not a blanket prohibition of evidence of other actions. Where the evidence might be relevant in another manner, as stated in the above references, i.e., "inter-connected," this Court has allowed it to be introduced. *Hurns v. State*, 616 So. 2d 313, 321 (Miss. 1993).

¶29. In *Mackbee*, where there were two crime scenes involved, this Court noted that when the officers' testified concerning what they discovered, their responses were unavoidable. *Mackbee,* 575 So. 2d at 28. Other observations made by this Court in *Mackbee* that supported evidence of other crimes being admissible included: 1) pictures entered into evidence which depicted what was present at the scene of the crime; 2) investigators preserving evidence; 3) lack of knowledge of how the defendant would be tried; and 4) placement of camera angles so as to exclude other victims-due to the lack of knowledge to do otherwise. *Id*.

¶30. In *Ladner*, where there were two victims at the scene, the trial judge stated:

As to the second victim at the scene, the two cases are so intertwined it's impossible as we discussed in pretrial, to disassociate one from the other. There must be some lapping into the second victim because the second victim was found right there at the scene with a bullet in her head, too. They can't go into the detail that they could go into if the defendant were on trial for the second victim today, but there is necessarily going to have to be some testimony that concerns itself with the other capital murder charge.

The references made regarding Tassin were necessary to tell the complete story of the crime. Both were killed in Holden's mobile home with the same gun. See *Griffin v. State*, 504 So. 2d 186, 191-92 (Miss.1987).

The issue is rejected.

*Ladner*, 584 So. 2d at 758.

¶31. Flowers cites *Stringer v. State*, 500 So. 2d 928 (Miss. 1986), to support his argument that the State employed a tactic of trying Flowers for the murders of all of the victims to inflame and prejudice the jury. In *Stringer*, the conviction was affirmed but the death sentence was vacated and remanded due to the improper influence of the State during the sentencing phase. The errors that required reversal included the introduction into evidence of color photographs of the body of Nell McWilliams (the second victim), which were also displayed to the jury during closing argument. *Id.* at 930. This Court, in *Stringer*, held that the admission of the pictures of the second victim, not the subject of the crime for which the defendant was being tried, did not constitute reversible error in and of itself, but reversal in that case was due to the fact that the pictures were used during closing argument and in the sentencing phase. *Id.* at 934. The *Stringer* Court also made note of the fact that this case was being reversed only on the sentencing phase and because of cumulative errors. *Id*. The State in *Stringer* clearly made remarks intended to implicate the defendant in the murder of the second victim:

But they left a witness. And who took care of that? There he sits. There he sits. And how did he do it? (Mr. Davis changing slides)

There it is. It's not my handiwork. It's not anything you did. That's his handiwork. He had to go back to do it. And how did he do it? What did Dr. Galvez say? Down on her hands and knees probably trying to crawl behind a table to hide? She wasn't standing up. Why didn't he shoot her in the back while she was standing up? That's his handiwork--his handiwork.

Again, during the closing argument in the sentencing phase, reference was made to the murder of Mrs. McWilliams.

*Id*. at 933.

¶32. The *Stringer* Court, clearly concerned with the prosecutor's overall trial tactic in admitting certain evidence regarding the second victim, noted that, "The question in this case is primarily only of relevance-were the photographs of Mrs. McWilliams' body **necessary** to establish the guilt of Jimbo Stringer in the murder of Mr. McWilliams?" The Court stated:

While the introduction of these pictures, in itself, did not constitute reversible error, the pictures must have had a highly inflammatory effect on the jury. First, the pictures were part of an overall scheme to, in effect, try Jimbo Stringer for the murders of both Ray McWilliams and Nell McWilliams. The prosecution introduced extensive evidence about both murders. . . .

Second, the prosecution could not be content with merely introducing the photographs of Nell McWilliams into evidence, but displayed them to the jury during closing argument as part of its "slide show." We deplore this practice. As the West Virginia court noted in *Clawson*, the effect is to take the pictures far beyond their evidentiary value and use them as a tool to inflame the jury. . . .

Just as a lack of evidence taints this process, so does the admission of irrelevant or inflammatory evidence. **Color slides of the body of another victim, projected on a screen during closing argument, are an unnecessary dramatic effect that can only be intended to inflame and prejudice the jury.**

*Id.* at 934-35(emphasis added).

¶33. The facts in the case sub judice are strikingly similar to the level of abuse as the facts in *Stringer*. Noting here that the issue is also one of relevancy of the evidence, this Court, as in *Stringer*, must determine whether the admission of photographs, slides, and extensive testimony regarding the killings of three other victims constituted a tactical scheme by the prosecutor to try Flowers for all four murders during this proceeding involving only the murder of Tardy.

¶34. Three of the bodies were found in virtually the same area in close proximity to each other. However, Bertha Tardy's body was some twenty feet away from the other bodies and toward the back of the store. In testifying as to his actions, Chief Hargrove described the scene when he arrived as follows:

Q. Did you notice anything about the body of Bertha Tardy?

A. She was laying on her stomach face down.

Q. What did you do then?

A. I proceeded on to where her body was.

Q. Okay, after you-

A. -Then-

Q. Go ahead.

A. After I got where her body was, I glanced to my right. That's when I seen Ms. Rigby.

Q. Would that be Carmen Rigby?

A. Carmen Rigby.

Q. Would you describe what you saw when you noticed Ms. Rigby's body?

A. I noticed BoBo still breathing.

Q. Okay, you say BoBo; was that Derrick Stewart?

A. Yes, sir.

Q. Okay, when you say breathing, would you describe for the jury's benefit what he was doing? Was he face down or face up?

A. Sort of face down gurgling, breathing. So then when I seen Robert's body too-

Q. You say Robert. Was that Robert Golden?

A. Robert Golden.

Q. Did you know all these individuals, Chief Hargrove, prior to that date?

A. Yes, sir.

Q. You have lived in Winona for, I assume, almost all your life?

A. Yes, sir.

Q. What did you do then?

A. After I seen all the bodies, I went-I didn't have my portable with me, so I went back to my patrol vehicle, and I called MedStat, and then I called for my backup.

¶35. While in *Mackbee* and some cases it may be important as well as proper to tell the whole story nevertheless, here, we observe a trial tactic or strategy by the prosecutor to continuously bring in unnecessary evidence of the other three killings thereby trying Flowers for all four murders in the same proceeding. Some of the evidence regarding the other killings clearly was admissible. However, other evidence, particularly that set out within this opinion, was unnecessary and thus not admissible. This calls for a weighing test of such evidence by the trial court in order to determine admissibility. This Court in *Ladner* pointed to the trial judge's ruling is allowing certain evidence, wherein the trial judge stated, "The references made regarding Tussin were unnecessary to tell the complete story of the crimes. *Ladner* , 584 So. 2d at 758 (citing *Griffin v. State,* 504 So. 2d 186, 191-92 (Miss.1987). The *Stringer* court as already noted, when considering admissibility of evidence of the other killings of Ms. McWilliams clearly held that only that evidence of the other crime was admissible that was "necessary to establish the guilt of Jimbo Stinger as to the murder of Mr. McWilliams." *Stringer*, 500 So. 2d at 934-35. The issue thus centers around only that evidence of the other three killings that was **necessary** for the State to prove its case against Flowers for the killing of Ms. Tardy. Here, the State's tactic concerning repeatedly using testimony and exhibits of all four murders commenced on opening argument, proceeded through the guilt phase and continued into the sentencing hearing. Such actions here are far more egregious than in *Stringer*, where we only reversed Stringer's sentence of death because similar, but to a lesser degree, error that occurred only during the sentencing phase.

¶36. There may not always be a necessity to tell the whole story. Cases such as this illustrate the point that the testimony of each witnesses and each item of evidence offered may or may not be relevant. Some evidence which is not necessary for the State to prove its case of capital murder of Ms. Tardy could be

unduly prejudicial to a defendant. Thus, all such evidence under Rule 404(b) must be filtered through Rule 403. The procedure used here is thus much like the method employed by the prosecutor in *Stringer*, which this Court condemned. This Court has also stated that "proof of a crime distinct from that alleged in an indictment is not admissible against an accused." *Tobias v. State*, 472 So. 2d 398, 400 (Miss. 1985) (citing *Mason v. State*, 429 So. 2d 569 (Miss.1983); *Tucker v. State*, 403 So. 2d 1274 (Miss.1981); *Allison v. State*, 274 So. 2d 678 (Miss.1973)). *See also Donald v. State*, 472 So. 2d 370, 372 (Miss. 1985) (well-settled rule in Mississippi that proof of crime distinct from that alleged in indictment is not admissible against accused); *Hughes v. State*, 470 So. 2d 1046, 1048-49 (Miss. 1985)(fundamental fairness demands that defendant retain his liberty unless proven guilty beyond reasonable doubt on indicted offense and that offense alone and proof of other crime is inadmissible).

¶37. In the case at bar, Tardy's body was located a short distance away from the other victims. During Chief Hargrove's testimony the prosecutor continued to elicit testimony regarding the other victims. The prosecutor introduced Exhibit S-17, color photograph, and Exhibit S-17A, a corresponding slide of the color photograph. These exhibits are pictures of the bodies of the other two victims, not Bertha Tardy. They had no relevancy to the case at bar. In *Mackbee*, the photographs which the Court found admissible were of two bodies in the trunk of the victim's car. The only way the investigators could have photographed the bodies separately would have been to remove one body from the top of the other. *Mackbee*, 575 So. 2d at 28. In the case at hand, Bertha Tardy's body was some twenty feet away from the other two bodies. Unlike the photographs in *Mackbee*, the relevancy of the photographs of the bodies of the other two victims here is tenuous at best.

¶38. The prosecutor continued the tactic of eliciting evidence of the other killings during the testimony of Sam Jones. Jones testified extensively about the other victims before Jones ever testified as to Tardy. The defense is correct in its allegation that "approximately 111 lines of Jones' testimony pertain to the other victims." The prosecutor repeatedly asked Jones about the other victims. He asked, "What else did you notice after you saw BoBo [Derrick Stewart] laying in the floor breathing in blood?" "So, we are talking about the puddle of blood that BoBo was laying in?" The slide of the other victims was shown to the jury also. More critically, during this same time, the prosecutor employed theatrics by asking Jones to "describe the noises that [Derrick Stewart] was making." Jones then demonstrated to the jury Derrick Stewart's gurgling sounds as he was gasping for breath in the pool of blood depicted in the photographs and slide. The theatrics employed by Jones's demonstration of Stewart's "gurgling sounds" as he was gasping for breath when coupled with the photos and slide depicting Stewart, alone in a large pool of blood, certainly raises relevancy to this case again as well as points to the possibility of undue prejudice.

¶39. The color photograph of the second victim alone was sufficient for this Court in *Stringer* to find reversible error. Here, the combination of the color photograph, slide and the theatrics employed is clearly reversible error.

¶40. During the testimony of Med/Stat/Ambulance Service owner Barry Eskridge, the prosecutor never asked a single question on direct examination about Bertha Tardy. Instead, again the prosecutor elicited testimony about Derrick Stewart. Eskridge described Stewart as "lying face down in a pool of blood around his face [and] [that] [he] was breathing, had a pulse; was not responsive at all." We again must ask how this evidence is relevant to the killing of Tardy. We conclude it is not relevant.

¶41. Melissa Schoene, an employee of the Mississippi Crime Lab, testified that she collected certain

evidence from the crime scene, including shell casings, projectiles and fragments. She also made photographs and made a crime scene sketch. She recovered one shell casing, Exhibit S-99, near Tardy's body. Pictures and slides of the casing were also introduced into evidence as Exhibits S-41, S-41A and S-42A. This particular shell casing was the only casing found in that particular area of the store where Tardy's body was located. The prosecutor contended that this casing was from the bullet which actually killed Tardy. This was never disputed by the defense.

¶42. However, the prosecutor proceeded to go further and to ask questions of Schoene and introduce Exhibit 100, a cartridge collected near Rigby, and Exhibits, S-95, S-96, S-97, and S-98, other shell casings, which were recovered near the bodies of Robert Golden and Carmen Rigby. The prosecutor then introduced Exhibit S-92, a projectile recovered near Golden and Exhibit S-93, a projectile recovered from under a love seat located within an area of the store other than where Tardy's body was found. Again, we must ask, how are this testimony and these exhibits relevant to the case at bar? Indeed, they cannot be relevant. The prosecutor then highlighted these irrelevant exhibits and the killings of Rigby, Stewart and Golden by introducing into evidence color photographs Exhibit S-16, S-21 along with the corresponding slides, Exhibits S-16A and S-21A, and showed them to the jury. Finally, during Schoene's testimony, the prosecutor introduced Exhibit S-20 and corresponding slide S-20A, a picture of only Robert Golden. Schoene was asked to give the jury explicit details of the crime scene depicted in this particular picture of victim Golden.

¶43. We fail to see any probative value of the testimony and exhibits remotely relevant to the indictment charging capital murder of Tardy. The evidence, both testimony and exhibits, is irrelevant. It appears that the only reason such photographs, slides and accompanying testimony unrelated to Tardy's murder were offered by the prosecution was to show that Flowers, in fact, killed four people rather than only one. We can only conclude that the admission of such evidence was highly prejudicial to Flowers.

¶44. Next, we consider the prosecution's questioning of Dr. Steven Hayne, the State's forensic pathologist. We fail to see the relevancy of testimony from Dr. Hayne elicited by the prosecutor concerning the autopsies of Rigby, Golden and Stewart as the same relates to this charge of capital murder of Tardy. This simply further supports Flowers's contention that there was a trial tactic pattern by the prosecutor to try Flowers for four murders rather than the sole murder of Tardy as charged in the indictment.

¶45. Finally, during the prosecutor's cross-examination of Flowers, he repeatedly referred to Flowers's "murdering four people." All of this occurred during the guilt phase of the proceedings. During closing argument at the guilt phase, the prosecutor again commented as to Derrick Stewart "on the floor . . . trying to breathe." He referred to Rigby, Golden, and Stewart lying in pools of blood. The prosecutor made similar comments on several occasions referring to the other three victims. There, the prosecutor stated that "he killed three other people," "he went into that store and he shot four people in the head, and he left them there dead."

¶46. We recognize that there are those cases which are so "inter-connected as to be considered part of the same transaction." M.R.E. 404(b) cmt. (citing *Neal v. State*, 451 So. 2d 743 (Miss. 1984)). We, therefore, continue to adhere to our established precedent that even though it may reveal other crimes, evidence or testimony may be given in order to tell a rational and coherent story of what happened and where it is substantially necessary to present a complete story. *Mackbee*, 575 So. 2d at 27-28 (citing *Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986)). Evidence may be admissible where it is integrally

related in time, place, and fact to the crime for which the defendant is being tried in order to allow the State to tell a coherent story of what happened to the victim. *McFee*, 511 So.2d at 136.

¶47. It is the "necessity" by the State to use the other evidence of three killings in order to tell a coherent story that is the key to its admissibility. The case at bar is not one of those cases so interconnected that mention of the other three murders is necessary to tell the whole story. Certainly it is not to the extent employed by the prosecution in the case at bar. Here, however, a pattern of trial tactic commenced at the beginning of trial and was continued by the prosecutor throughout the guilt phase of the proceedings including closing argument. If the evidence relating to the other three murders was relevant to any one of the acceptable purposes listed in Miss. R. Evid. 404(b), a description of the crime scene may have been helpful. However, the numerous additional descriptions of the other victims and photographs could do nothing but inflame the jury.

¶48. It is noteworthy that the defense made a motion in limine prior to trial asking that the State be prohibited from offering evidence regarding the other three killings in this trial which was solely for the capital murder of Ms. Tardy. Defense counsel, referring to the district attorney, reminded the trial court "Your Honor, as he stated, he had the right to select. It was his choice to proceed with four separate indictments on four separate trials and four separate counts. It would be highly prejudicial to bring forth evidence of another crime not being charged in the indictment." The trial court simply stated, "Okay, that motion is overruled."

¶49. Thereafter, during the testimony of the State's first witness, Johnny Hargrove, the State offered certain color photographs, Ex. S-15 and Ex. S-17 which showed other victims and "close-up of the blood, "to which defense counsel objected" Your Honor, we are going to object. They are unduly and highly prejudicial. There are other photographs that would better and more accurately depict how Ms. Tardy was located if that's what they intend on doing." The trial court merely stated, " The objection is overruled."

¶50. As already noted, Rule 404(b) is not a blanket prohibition of evidence of the other killings, however, proof of other acts or crimes of the defendant which are offered into evidence pursuant to Rule 404(b) is still subjected to the Rule 403 requirement that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 is clearly the "ultimate filter through which all otherwise admissible evidence must pass." *Bounds v. State*, 688 So. 2d 1362, 1370 (Miss. 1997). This Court has consistently held reversible error exists when considering the admissibility of certain evidence under Rule 404(6), when "it remains clear that the required balancing test of Rule 403 was never conducted."*Watts v. State*, 635 So.2d 1364, 1368 (Miss. 1994). In the case at bar there is a total absence of any ruling by the trial court as required by Rule 403 and our caselaw per *Bounds* and *Watts* that when considering the admissibility of certain evidence of the other crimes that its probative value substantially outweighs the danger of any unfair prejudice. Absent such a Rule 403 balancing test at any portion of this record, the trial court erred for failure to conduct such a test.

¶51. This Court has previously reversed and remanded due to admission of "other murders." *Snelson v. State*, 704 So. 2d 452 (Miss. 1997); *West v. State*, 463 So. 2d 1048 (Miss. 1985). The Court has also affirmed guilt but reversed and remanded for a new sentencing hearing due to admission of other murders, where color slides of the victim other than the one for which Stringer was being tried were shown to the jury. *Stringer v. State*, 500 So. 2d 928 (Miss. 1987).

¶52. Here, we find that while any one of the single incidents complained about by Flowers, standing alone

constitutes reversible error, yet the cumulative effect of the prosecutor's pattern of repeatedly citing to the killing of the other three victims throughout the guilt phase proceedings leads us to hold that Flowers was absolutely denied a fundamental right to a fair trial. The cumulative pattern of overkill by the prosecutor in repeatedly mentioning the other killings unnecessarily during the guilt phase in our view is far more egregious than that which occurred in *Stringer*. Although similar to *Stringer*, the case at bar exceeds the complained of conduct there that this Court found warranted only a reversal of the sentence of death.

¶53. Finally, we note that one of the aggravators that the jury found was that Flowers created a great risk of death to many people. This Court has allowed evidence of other crimes against other victims during sentencing where this aggravator has been sought by the State and the proof supported it. *See McGilberry v. State*, 741 So. 2d 894, 925 (Miss. 1999) (robbery case where four murders were committed and where the aggravator of creating a great risk of death to many people was given and the proof supported). We note however, that the District Attorney in *McGilberry* tried all four murders together. The Court has also considered this same aggravator and rejected it because of the lack of proof to support the giving of such an aggravator, because the Court stated "there is no evidence that Porter **knowingly** created a great risk of death to anyone, other than Brown, his intended victim." *Porter v. State*, 732 So. 2d 899, 905-06 (Miss. 1999) (citing *Jackson v. State*, 684 So. 2d 1213, 1235 (Miss. 1996 )). Thus, evidence regarding the other killings would have been relevant in the case at bar during sentencing, whereas during the guilt phase, although some of the evidence is probably admissible, the overwhelming prejudicial evidence regarding the killing of the other three victims was for the most part irrelevant and inadmissible. The admission of this irrelevant, inadmissible testimony and exhibits was substantially prejudicial to Flowers. Therefore, we must reverse and remand for a new trial on guilt and if necessary, sentencing. On remand, if a sentencing hearing becomes necessary, and if the prosecution alleges as one of the aggravators that Flowers created a risk to many people, then evidence regarding the other three killings would be relevant at sentencing.

### III. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

¶54. Flowers next argues that prosecutorial misconduct occurred during several phases of the trial and these actions plus the cumulative effect of these actions denied his right to a fair trial. A review of the record below reveals that defense counsel failed to object to many of these statements. It is the duty of trial counsel to promptly make objections if he deems that opposing counsel is overstepping the wide range of authorized argument, and then insist upon a ruling by the court. *Evans v. State*, 725 So. 2d 613, 670 (Miss. 1997). The trial judge will first determine if the objection should be sustained or overruled. *Id*. The judge is in the best position to weigh the consequences of the objectionable argument. *Id*. If he decides that serious and irreparable damage has been done, he can grant a mistrial. *Id.* If the argument does not warrant a mistrial he can just admonish the jury to disregard the improper comment. *Id.* In death penalty cases the contemporaneous objection rule is applicable. *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996) (citing *Cole v. State*, 525 So. 2d 365, 369 (Miss.1987) (holding that applicability of contemporaneous objection rule "is not diminished in a capital case"); *Lockett v. State*, 517 So. 2d 1317, 1333 (Miss.1987) ).

¶55. Many of Flowers's sub-claims are thus procedurally barred because they were not the targets of a contemporaneous, or any other objection during the trial. Only one objection was made by Flowers during the prosecutor's closing argument. Many of the sub-claims do not warrant discussion because of the

procedural bar. However, heightened scrutiny applies in death penalty cases. Plain error applies to the issues we discuss hereafter. ***Foster v. State***, 639 So. 2d 1263, 1289 (Miss. 1994)(citing ***Gray v. State***, 487 So. 2d 1304, 1312 (Miss. 1986) ("defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal")). However, two sub-claims warrant discussion: 1) the cross-examination of Flowers regarding the taped interview, and 2) the attempted impeachment of witnesses by the D.A. without a factual basis.

### A. During The Guilt Phase -The District Attorney Attempted Impeachment of Witnesses.

¶56. Flowers claims that the State improperly cross-examined witnesses on prior inconsistent statements, but then never presented any evidence to prove that any of the alleged prior statements had ever actually been made. The State argues that Flowers failed to allege that the questions were not asked in good faith and that had he done so the State would have produced the statements in a proffer to be included in the record.

¶57. Rule 613 of the Mississippi Rules of Evidence which pertains to prior statements of witnesses provides:

> (a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, *but on request* the same shall be shown or disclosed to opposing counsel.

> (b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an *opportunity to explain or deny* the same and the opposite party is afforded an *opportunity to interrogate* him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

(emphasis added) There is no longer the requirement that the witness be directed to the statement on cross-examination as to a particular time or sequence. See M.R.E. 613 and comments. The witness should just be given an opportunity to explain the statement, and the opposite party must be given an opportunity to examine the statement. "Under this procedure, several collusive witnesses can be examined before disclosure of a joint prior inconsistent statement." M.R.E. 613 and comments. However, this Court has also held that the stricter standard should be followed, and we have required the questions to include, "whether or not on a specific date, at a specific place, and in the presence of specific persons, the witness made a particular statement." ***Carlisle v. State***, 348 So. 2d 765, 766 (Miss. 1977) (citations omitted). "Then with the predicate properly laid, the witness may be impeached by showing prior statements inconsistent with the in-court testimony, so long as the statement made in court is one relevant to the issue in the case and therefore not collateral. ***Id.*** (citing ***Williams v. State***, 73 Miss. 820, 19 So. 826 (1896), *aff'd*, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012 (1898)).

¶58. More importantly here, counsel must have a good faith basis for any question asked on cross-examination; therefore, counsel may not use prior inconsistent statements as a "guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." ***Harrison v. State***, 534 So. 2d 175, 178 (Miss. 1988)(citations omitted) (emphasis in original); ***Foster v. State***, 508 So. 2d 1111, 1115 (Miss. 1987).

¶59. In ***Harrison***, where the prior statements were offered as circumstantial evidence from which the jury could infer that the trial testimony of the witness was unreliable, this Court stated that the statements were not hearsay. 534 So. 2d at 179. The trial judge could have sua sponte instructed the jury to consider the prior statements as impeachment evidence only, but the failure to do so was harmless error when there was ample evidence from which the jury could find the defendant guilty of murder; the statements were disclosed in open court to the witness and opposing counsel; the witness was on the witness stand and available for interrogation by counsel opposite concerning the inconsistencies; and the jury's ability to obey such an instruction is questionable. ***Id***. As in ***Harrison***, "[t]he point of this inquiry is to expose to the jury the witness' special motive to slant, unconsciously or otherwise, his testimony." ***Id***. *See also **Cantrell v. State***, 507 So. 2d 325, 330 (Miss. 1987) (bias is always material). As a note, attempting to distinguish the cases cited to by Flowers, the State points out that in ***Harrison*** the State was trying to impeach its own witness. ***Harrison***, 534 So. 2d at 180. In ***Hosford v. State***, 525 So. 2d 789 (Miss. 1988), the only evidence the State had against Hosford was the prior unsworn statement of the State's own eyewitness. This Court stated the record showed no evidentiary basis to ask the questions that were asked of the defendant. ***Hosford*** at 792. The numerous instances of prosecutorial misconduct here (including but not limited to the introduction of matters totally unsupported by any evidence) resulted in a denial of Flowers's right to a fair trial. When this occurs, this Court must reverse. *See, e.g., **Wilkins v. State***, 603 So. 2d 309, 317-22 (Miss. 1992)(reversing murder conviction due to prosecution's tactics of introducing inadmissible evidence); ***Griffin v. State***, 557 So. 2d 542, 552-54 (Miss. 1990) (reversing capital murder conviction due to cumulative effect of improper prosecutorial acts which denied defendant fundamentally fair capital murder trial); ***Hosford***, 525 So. 2d at 791-94 (reversing conviction due to prosecutorial misconduct in improper cross-examination including matters unsupported by evidence resulting in a denial of fair trial); ***Williamson v. State*** , 512 So. 2d 868, 872-75 (Miss. 1987) (reversing capital murder conviction due to prosecution's improper admission of evidence); ***Foster v. State***, 508 So. 2d 1111,1114-15 (Miss. 1987) (reversing capital murder conviction and stating that counsel must have a "good faith basis for any question asked on cross-examination"); ***Hickson v. State***, 472 So. 2d 379, 384-85 (Miss. 1985) (reversing murder conviction due to prosecutorial misconduct resulting in denial of right to fair trial, citing cases prohibiting prosecutor from insinuation of matters unsupported by evidence); ***Fuselier v. State***, 468 So. 2d 45, 49-50 (Miss. 1985) (reversing capital murder conviction due to improper actions of prosecutor denying defendant his right to a fair trial); ***Smith v. State***, 457 So. 2d 327, 333-35 (Miss. 1984) (reversing conviction due to prosecutorial misconduct in manner of questioning witnesses and resulting denial of a fair trial, citing numerous cases); ***Collins v. State***, 408 So. 2d 1376, 1380-81 (Miss. 1982)(reversing conviction due to cumulative effect of prosecutorial misconduct, including improper statements regarding evidence not in record, which denied defendant right to fair trial); ***Clemons v. State***, 320 So. 2d 368, 371-73 (Miss. 1975)(reversing conviction due to prosecutorial misconduct in arguing facts not in evidence denying defendant of his right to a fair trial); ***Sumrall v. State***, 272 So. 2d 917, 919 (Miss. 1973) (reversing conviction since defendant denied right to a fair trial due to cumulative effect of prosecutor's actions).

¶60. Here, the State tried to impeach the defense non-party witnesses. Flowers argues that prosecutorial misconduct occurred during the guilt phase in numerous situations. We first consider Connie Moore's testimony that she had bought a pair of Fila Grant Hill tennis shoes for her son, after which the State tried to show that she had bought them for Flowers. On cross-examination of Moore the State questioned her about the shoes:



Q. Did you tell your son Lemarcus Moore that you wanted him to go to Curtis' lawyer, Mr. Gilmore, and lie for Curtis, tell him that Curtis was at home all morning that day? Did you also tell him that Curtis was already in enough trouble; he was going to have to lie for him, and did you further tell your own son that you wanted him to lie and say that Curtis didn't have any Fila shoes, that the only one in the household that owned Fila shoes was his brother Marcus?

A. No, sir.

Q. Do you deny telling your son those things?

A. I didn't.

Q. Do you know of any reason that your son would have to say that you asked him to lie if you didn't?

A. No, sir.

Q. Do you remember buying these shoes?

A. Yes, sir.

Q. You bought them in Greenwood, didn't you?

A. Yes, sir.

Q. Patricia Hollman was with you when you bought them, wasn't she?

A. No, sir. She wasn't.

Q. Let me ask you this. Do you remember the day you bought those shoes telling Patricia Hollman that you were buying those for Curtis' birthday present?

A. No, sir.

Q. Do you deny that?

A. Yes, sir.

Q. And if she said that, that wouldn't be true?

A. It wouldn't.

Q. So you deny that she was with you when you bought the shoes, and you further deny that you told her you were buying them for Curtis?

A. Yes, sir.

The proper predicate for impeachment was laid. *Carlisle*, 348 So. 2d 766. The witness was given an opportunity to explain or deny, which she did. Defense counsel did not object. However, we find the prosecutor's actions to be plain error. *Brown*, 690 So. 2d at 297 (defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal). *See also Foster v.*

*State*, 639 So. 2d 1263, 1289 (Miss. 1994) (citing *Gray v. State*, 487 So.2d 1304, 1312 (Miss.1986)). Here, Moore flatly stated that she did not make the statement to Hollman that she had bought the shoes for Curtis's birthday. The State was required to continue with the impeachment and show a basis in fact for the question, or to offer a subsequent witness in rebuttal to prove Moore's prior statement was true and that Moore lied. The State's tactic here was in bad faith because the State had no basis in fact to make such a claim. On rebuttal, the State never refuted Moore's denial. Hollman testified as a State's witness and was never asked this same question by the State. Nor was she produced in rebuttal after the prosecutor posed this insinuation to Moore who flatly denied it. We find that this was clearly error by the State.

¶61. Flowers also asserts that the State erred during additional questions posed to Connie Moore. The State asked Moore whether she had asked her son to lie for Flowers and state that he did not own any Fila tennis shoes. This too was clearly improper questioning. While the State did not deny Flowers the opportunity to question these witnesses about a prior inconsistent statement that they were not first asked about in open court and given the opportunity to deny, that is not the issue at hand. The potential impeaching witness was apparently present. The State never offered proof that in fact would have impeached witness Moore's outright denial that she had ever asked her son to lie for Flowers or state that he did not own any Fila tennis shoes.

¶62. This Court has recently addressed this issue in *Walker v. State*, 740 So. 2d 873 (Miss. 1999), wherein the Court stated:

> The asking of questions without a factual basis leaves an impression in the mind of jurors that the prosecutor actually had such facts in hand and that the insinuations through questioning contained some truth. This leaves false and inadmissible ideas in the minds of jurors that cannot be adequately rebutted by the testimony of witnesses or instructions from the court.

*Id.* at 884. *Walker* further cited to a prior case concerning this same issue of prosecutors questioning witnesses with no evidentiary basis for the questioning when making direct accusations to witnesses who deny same, and then the State makes no attempt to prove them. This Court has clearly held that "it is prejudicial error for questions on cross-examination to contain insinuations and intimations of such conduct when there is no basis in fact." *Id.* (citing *Hosford*, 525 So. 2d at 793). Here, the prosecutor clearly made no attempt to prove that Moore had lied when she denied these questions posed to her on cross-examination. We find error in the State's failure to offer proof that Moore lied. Such questioning without evidentiary basis has been found by this Court to be inflammatory and extremely prejudicial. *Id.* It certainly was prejudicial in the case at bar.

### B. The Defendant's Taped Interviews

¶63. Flowers admitted during cross-examination that he had given a taped interview. The district attorney cross-examined Flowers regarding prior statements made to law enforcement. Flowers had given two different statements on two different days, the first on July 16, 1996, and a second on July 18, 1996. During cross-examination, the District Attorney held up the tape recording, and stated, "[w]ell, all of this is on one taped statement that I'm holding right here." This tape was not introduced into evidence. Furthermore, the District Attorney implied, when holding the taped statement, that Flowers had given several different times for when he had gone to his sister's house on the day of the murder, July 16, 1996, in a statement given to Officer Jack Matthews on July 16, 1996. However, the statement the District Attorney was using on cross-examination was not the one given on July 16. In the State's own Motion, the State

admits that the District Attorney cross-examined Flowers by use of a "transcript of the **tape** recorded statement" (emphasis added). At trial, Officer Matthews testified that he took two (2) statements of Flowers, one at 1:30 on July 16 and one on July 18. Matthews further testified that the July 18 statement was **taped**, but the July 16 statement was **not taped or even written**.

¶64. The District Attorney combined the portion of the second statement with that given in the first statement which was obviously confusing. Defense counsel promptly objected that the District Attorney was combining the two separate statements, thereby confusing or misleading the jury. The State argues that defense counsel had the opportunity during his re-direct of the defendant to clear up any confusion over what was on the tapes, because the trial court had stated, "Well, you have got a right to come back on redirect . . . ." However, on redirect, when defense counsel attempted to clarify the confused statements, the District Attorney objected. To further compound the error, the trial judge, in front of the jury, in complete disregard of his prior ruling, stated, "There was no confusion in relation to what was brought out on cross-examination." The tape recording was not in evidence and was never played so that the jurors could determine for themselves whether on that particular tape Flowers had been inconsistent with different versions of what occurred. This was clearly misleading and confusing to the jury.

¶65. During closing argument the State referred to the taped interview concerning the supposed discrepancies of the times given by Flowers as to when he went to his sister's house. The District Attorney stated:

> I want you to remember that the one statement that I kept asking him about all the inconsistencies of was the one statement given on one day that was tape recorded. Every one of those inconsistencies that I got him to admit were in there were in that same statement. We are not talking about different dates that he told different things. He told that many different versions one time.

¶66. We find an abuse of the prosecutor's right to argue about the supposed inconsistent statement made while holding a tape to the jury, not admitted into evidence. These statements, although discussed in trial, were clearly two separate statements given on different days and, about which the prosecutor was clearly in error, thereby possibly confusing and misleading the jury. This error was compounded further by the trial court's comment in refusing to allow rebuttal evidence to clear up any confusion regarding the issue of the two statements. It is noteworthy that the State during oral argument before this Court, admitted that the prosecutor, while holding up the tape recording before the jury, clearly referred to the incorrect date of the supposed inconsistent taped statement by Flowers given to law enforcement officers. We find merit to this issue, as clearly prejudicial error was committed by the prosecutor.

### C. The Sentencing Phase

¶67. Finally, Flowers claims that the prosecutor erred during the sentencing phase when during the cross-examination of his mother, Lola Flowers, evidence of "other crimes" was improperly introduced into evidence. The District Attorney questioned her concerning an account of a supposed intentional shooting by Flowers of James Townsend. Reportedly, Flowers was only 15 years old at the time. Lola Flowers attempted to explain by saying in response, "Because they were playing with guns. It's not like he just shot him for doing nothing. Both of them had the gun." The defense promptly "[objected] to this line of questioning," however, the trial court, in allowing the questioning to continue stated, "Well he is entitled to question her about it, and she is entitled to answer it to the best she can." The District Attorney however provided further details and asked Lola Flowers if she would agree with him that, Flowers "pointed a gun at

James D. Townsend and said, "I'm going to shoot you," and pulled the trigger shooting him in the chest?" Lola Flowers denied that stating, "No, I would not." The District Attorney further indicated that at that point Flowers threatened Townsend and told him, "not to tell anybody he shot him." Even if this supposed prior crime was true, material and, relevant to the case at bar, the District Attorney would be prohibited from eliciting details of any prior conviction as was attempted during Lola Flower's cross-examination. However, no evidence was ever offered by the State to support this supposed prior crime, much less any conviction. The only proper evidence which could have been offered, if the incident was true and relevant to the trial at hand, would have been admissible through Townsend, or alternatively, a copy of an indictment and judgment of conviction. This was not done in the case at bar. A prosecutor is prohibited from "insinuating criminal conduct which is unsupported by any proof." *Smith v. State*, 457 So. 2d 327, 334 (Miss. 1984) (citing *Stewart v. State*, 263 So. 2d 754 (Miss. 1972)). Here there was no proof of the shooting of Townsend ever offered to the jury. This Court held in *Tobias v. State*, 472 So. 2d 398, 400 (Miss. 1985) that the prosecutor's direct examination of a store clerk regarding the defendant's alleged prior crime which did not result in conviction required reversal.

¶68. The State argues that *Jordan v. State*, 728 So.2d 1088 (Miss. 1998) is controlling. In *Jordan*, the prosecution cross-examined a mother regarding the fact that her son had been charged with at least four crimes in Youth Court after she testified that her son had never been in trouble with the law. *Id.* at 1097-98. On appeal, the defense counsel argued that the prosecutor should not have been allowed to inquire into prior Youth Court matters, maintaining that such matters may prejudice the jury's deliberations in the sentencing of the accused. *Id.* at 1098. This Court held the following:

> We have previously allowed inquiry into prior juvenile records on cross-examination when introduced to rebut the opinion testimony of the mother of the accused. *Evans v. State*, 422 So.2d 737 (Miss. 1982). In *Evans*, we found no fault with a similar line of questioning because "no attempt was made to introduce any adjudication order. Also, the questions asked were proper to test the recollection of the witness and were in rebuttal." *Id.* at 745. The present issue directly mirrors the *Evans* facts; therefore, we conclude the questioning was proper and did not prejudice the jury.

*Jordan* at 1098.

¶69. *Jordan* can be distinguished from the case at hand. In the case sub judice, this Court does not find the District Attorney's cross-examination improper because it pertained to a youth court matter; rather, this Court found that the cross-examination was improper because a "prosecutor is prohibited from insinuating criminal conduct which is unsupported by any proof." In the present case, the District Attorney improperly cross-examined the witness regarding alleged details of this supposed crime. No evidence was offered by the State to support this supposed crime, much less any conviction. The cross-examination of Lola Flowers is yet another example of improper actions by the District Attorney which is clearly error.

### VIII. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY OVERRULING FLOWERS' OBJECTIONS TO THE TESTIMONY OF JACK MATTHEWS.

¶70. Flowers argues that reversible error occurred when the trial court, over objections from the defense, allowed Investigator Jack Matthews to testify from a business ledger which indicated money was missing from the furniture store, since the evidence of a robbery was "extremely minimal." Flowers charges that Matthews was the only person who actually testified that any money was missing and that since he was allowed to testify without the proper predicate being established his statement was hearsay. The State

argues that the testimony of Matthews makes it clear that his conclusion on how much money was missing was not based on what someone else told him but on his interpretation of the ledger.

¶71. At common law hearsay exceptions developed which furnished guarantees of truth-worthiness and reliability which have been incorporated into the hearsay provisions of the uniform rules. M.R.E. Article VIII(cmt.). There are five requirements for admission under the "other exceptions" provision of Rule 803(24): (1) trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice. M.R.E. 803(24). Judicial discretion is required to determine the admissibility of evidence under this rule, and the judge's ruling will not be overturned on appeal except for an abuse of discretion. *Leatherwood v. State*, 548 So. 2d 389, 401 (Miss. 1989) (citing *United States v. Friedman*, 593 F.2d 109, 118 (9th Cir.1979)).

¶72. In the case sub judice, the ledger is a business record. The foundational requirements for business records are:

1) the statement is in written or recorded form;

2) the record concerns acts, events, conditions, opinions or diagnoses;

3) the record was made at or near the time of the matter recorded;

4) the source of the information had personal knowledge of the matter;

5) the record was kept in the course of regular business activity; and

6) it was the regular practice of the business activity to make the record.

¶73. The comments to the rules also state that there must be testimony from a foundational witness to provide evidence of the foundation requirements. M.R.E. 803(6) and cmt. Accordingly, the ledger found at the store would be a business report. Here the "custodian" of the records is unavailable, as she was one of the victims found dead at the scene of the crime. Thus the foundation for introduction of the business records was established through the investigator who discovered the records at the scene and through Tardy's daughter (Ballard), both of whom were qualified witnesses under M.R.E. 803.

¶74. At trial it was established that Matthews recovered the ledger from a desk at the furniture store on the morning of the murders. He identified the ledger and described it to be a record of the cash on hand for the store's operations. It was admitted into evidence with no objections. When the State asked Matthews if he was able to determine through his investigation how much money was missing from the cash drawer, the defense objected that the proper predicate had not been laid to show how Matthews made his determination. The court overruled the objection when the State clarified his statement and said, "All we are asking is for his investigation **after he was advised how to read the ledger sheet**."(emphasis added).

¶75. Later, Ballard, Tardy's daughter, testified that she was involved to some extent in the business at Tardy's and that she was familiar with how the business was run. She described the normal operating procedures at the store. She described what her mother would do every morning after she had entered the building: "go to her office and unlock the safe and take the things necessary for business, the cash drawer, and the accounts receivable book and the receipt book out and take it to the front office." After looking at the ledger, Ballard testified that the ledger indicated that there was $400 in the drawer. Ballard also testified

that Carmen Rigby, the bookkeeper, had worked at Tardy's for 20 years and that she usually got to work, "anywhere from 10 after to 9:30." Every morning she would, "come in and take the receipt book to see what had come in the day before and that morning in the mail and make up a deposit and count the drawer and balance the drawer and then go to the bank." Ballard testified that a deposit had been made on the morning of the murders.

¶76. Ballard was clearly the proper source of the detailed information since she had personal knowledge of how the business was operated. She was involved in the business to some extent and was, therefore, qualified to interpret the ledger sheet. Since the bookkeeper was one of the victims, the ledger had to be authenticated by someone other than the custodian. Ballard qualified as a witness to authenticate the record. We find that Matthews, should only have been allowed to introduce the ledger which he found during his investigation, not testify about the details therein and interpret the ledger's contents.

¶77. The judge overruled the defense's objection that the ledger was hearsay, and we find clear abuse in his ruling. The ledger was a necessary and reliable source of evidence since the bookkeeper was not available to testify. Once it was admitted, although its contents did not necessarily require an expert to describe what it contained, it did require someone who was familiar with the contents, terms and meaning of the ledger. The only person who testified who fit that description was Ballard. Because the ledger met the requirements of a business record under M.R.E. 803(6), it could be admitted into evidence, but the interpretation of this document required someone who was familiar with it and could explain it to the jury. Matthews could not so interpret the ledger, but Ballard could.

¶78. It is not uncommon to allow the introduction of records that contain evidence for which the defendant is on trial. *Kettle v. State*, 641 So. 2d 746, 750 (Miss. 1994). A recent decision by this Court in *Harkins v. State*, 735 So. 2d 317, 321 (Miss. 1999), held that "the admission of calibration certificates without testimony from the calibration officer does not, in general, violate either the hearsay rule or the confrontation clauses in the Mississippi or United States constitutions, as long as the proper foundation is laid." In the case sub judice, the business ledger qualified under Rule 803(6) as data kept in the regular course of business. However, the better practice would have been to allow only Ballard to testify about the ledgers contents, because of the need to explain about the money which should have been at the store that morning.

¶79. Matthews testified that he recovered the ledger sheet from the desk at the furniture store on the morning of the murders. Matthews testified that the ledger sheet, which was entered into evidence, appeared to show the cash on hand for the day. Later, in his testimony, Matthews began to testify as to the amount of money that the ledger would indicate was missing from the cash drawer, whereupon the defense objected as to the knowledge of the witness as to his determinations. The State argued that the question was toward what his investigation revealed after he had been advised on how to read the ledger sheet. Matthews was clearly testifying to double hearsay. He could not have read and interpreted the ledger but for instructions on how to do so by someone who knew that particular ledger. In fact, that is exactly what occurred according to the record. The court overruled the objection, and Matthews was able to testify that approximately $287 was missing from the cash drawer. The better procedure was clearly to allow Matthews to tell how and where he found the ledger, mark it for identification purposes and then to allow Roxanne Ballard to have introduced the records, provide for their authenticity, and in interpreting the document, testify as to procedures and how much money was missing, if any. There was additional testimony from the cell mate, Veal, that Flowers had confessed to him that he had taken some money. There was also testimony during the trial concerning the fact that Flowers did not receive his pay check for

the short time that he had worked at Tardy's due to damages to batteries that he caused. There was also testimony that Tardy had told Flowers that she no longer needed him to come to work. Additionally, some $250 was recovered by authorities from the bedstead where Flowers had lived. The ledger was relevant to show that there was evidence that a robbery had taken place, and from this evidence, the jury could decide the issue. Ballard's testimony adequately covered the ledger and other evidence indicating proof that a robbery occurred.

¶80. Although we find error in allowing Matthews to testify about the ledger's content, there was more than sufficient other testimony which supports the fact element of proof required of the State to establish that a robbery occurred. Thus, Matthews's testimony about the ledger was harmless beyond a reasonable doubt. On retrial, however, we suggest the aforementioned procedure be followed of allowing only Ballard, who was evidently the only person who could interpret the ledger, to testify about the ledger's contents.

### XX. FLOWERS WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF THE MATTERS ADDRESSED ABOVE.

¶81. In his final assignment of error Flowers urges this Court to reverse his conviction and sentence based upon the cumulative impact of the errors at his trial. The State cites to *Foster*, where this Court held that the defendant did not provide a listing of "near errors" and the Court was left to create a list and found none. *Foster v. State*, 639 So. 2d 1263 (Miss. 1994). Finding no errors individually, there were none cumulatively. *Id*. The State further argues that even if some errors were found by this Court, this Court must consider the errors as a whole and the result must be a denial of a fair trial in order for there to be a reversal. (citing *Williams v. State*, 445 So. 2d 798, 810 (Miss. 1984)).

¶82. Our case law allows an accumulation of otherwise harmless error to result in reversal. *See Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss.1992); *Griffin v. State*, 557 So. 2d 542, 552-53 (Miss.1990). *See also United States v. Garza*, 608 F.2d 659, 665 (5th Cir.1979).

¶83. This Court has reviewed this case with "heightened scrutiny," and the errors, as cited previously, any one of which standing alone is sufficient to warrant reversal, nevertheless, when considered together, have such a cumulative effect as to require reversal. The cumulative effect of all of these errors is obviously the most substantial reason for this Court's reversal of this case. We therefore find merit to Flowers's argument on accumulation of error.

## CONCLUSION

¶84. For these reasons, we reverse the judgment of the Montgomery County Circuit Court, and we remand this case for a new trial consistent with this opinion.

¶85. **REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., PITTMAN, P.J., AND WALLER, J., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. BANKS, P.J., CONCURS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, J. COBB, J., DISSENTS WITH SEPARATE WRITTEN OPINION. MILLS AND DIAZ, JJ., NOT PARTICIPATING.**

BANKS, PRESIDING JUSTICE, CONCURRING IN PART:

¶86. I agree with the majority's disposition of this case and most of what it says. I write separately to note that I would not term the Matthews testimony harmless. That testimony was speculation based upon hearsay, and, coming as it did from a Highway Patrol investigator, had the potential to take on added significance on a crucial issue. In my view, the later testimony of one more familiar with the source of the documents from which Matthews drew inferences does not render the error in admitting Matthews's testimony harmless.

¶87. Instances such as this should not be encouraged by our failure to acknowledge that they may be reversible error. *Wells v. State*, 698 So.2d 497, 519 (Miss. 1997) (Banks, J., concurring in part and dissenting in part). Nevertheless, the error is of no moment here, because we have reversed for other reasons.

### McRAE, J., JOINS THIS OPINION.

### COBB, JUSTICE, DISSENTING:

¶88. I respectfully dissent. In my opinion, there was more than sufficient evidence to prove that Curtis Giovanni Flowers murdered Bertha Tardy and to affirm the conviction and the sentence imposed by the jury. Although errors were made by the prosecution, I do not believe that individually or cumulatively the errors were so prejudicial that Flowers was denied a fair trial.

¶89. Flowers cited twenty errors in his appeal to this Court. The majority bases its reversal on only four of these errors, apparently concluding that the others were either without merit or were harmless error. While recognizing that even a single error may be of such magnitude as to require reversal of a case, my review and understanding of the record and the law in this case does not lead me to reach the same conclusion as the majority.

¶90. The majority finds that the following errors prejudiced Flowers and require reversal:

> 1. Flowers was denied his fundamental right to a fair trial by the admission of evidence and argument of other crimes.

> 2. Flowers was denied his fundamental right to a fair trial due to prosecutorial misconduct.

> 3. The trial court committed error by overruling Flowers's objections to the testimony of Jack Matthews.

> 4. Flowers was denied his fundamental right to a fair trial by the cumulative effect of the matters addressed above.

¶91. I respectfully disagree.

### 1. Flowers was not denied his fundamental right to a fair trial by the admission of evidence and argument of other crimes.

¶92. The majority is correct in stating that evidence of other crimes is generally not admissible to show that the party acted in conformity with past behavior, but Rule 404(b) provides an exception as to the admission of other crimes. The comment to Rule 404(b) states in pertinent part:

(b) . . . Evidence of another crime, for instance, is admissible where the offense in the instant case and in the past offense are so inter-connected as to be considered part of the same transaction. ***Neal v. State***, 451 So.2d 743 (Miss. 1984).

¶93. There is no question that the four murders were committed by the same person, with the same weapon, at the same time, and in the same place. Thus, they clearly are inter-connected and part of the same transaction. So there is no violation of Rule 404(b).

¶94. The majority is also correct in its statement that where other crimes or "bad acts" of the defendant are offered into evidence pursuant to Rule 404(b), it is still subject to the requirements that its probative value outweigh any resulting unfair prejudice under Rule 403, which is the "ultimate filter through which all otherwise admissible evidence must pass", citing ***Bounds v. State***, 688 So.2d 1362, 1370 (Miss. 1997). In ***Bounds***, however, this Court found that the State had failed to establish a time frame during which the other "bad acts" occurred, thus "...seem[ing] to allow any bad act committed at any time by a defendant to come in...", which is "exactly what the Rules of Evidence seek to prevent." ***Id***. at 1370. In the present case, the time frame was clearly established. The four murders occurred at the same time.

¶95. The majority then cites ***Mackbee v. State***, 575 So.2d 16, 27-28 (Miss. 1990) (citing ***Brown v. State***, 483 So.2d 328, 330 (Miss. 1986)), in which this Court held (in applying Rule 404(b)) that even though it may reveal other crimes, evidence may be admitted in order to tell a rational and coherent story of what happened and where it is substantially necessary to present a complete story. In the present case, the State put on evidence, through the several witnesses mentioned above, simply to tell a rational and coherent story of what happened and what they saw at the crime scene on the morning that Bertha Tardy was murdered. I respectfully disagree with the majority's conclusion that "the State improperly employed a tactic of trying Flowers for all four murders during this trial...solely to inflame and prejudice the jury." Citing cases which are arguably more favorable to the State's position than to Flowers's position, the majority opines that "[e]vidence of the other crime is also admissible if it sheds light upon the motive or if it forms a part of a chain of facts intimately connected so that in order to interpret its general parts, the whole must be heard." ***Davis v. State***, 530 So.2d 694, 697-98 (Miss. 1988). Further, the majority states that "[t]he above rule has also applied when the evidence is integrally related in time, place, and fact to the crime for which the defendant is being tried in order to allow the state to tell a coherent story of what happened to the victim." ***McFee v. State***, 511 So.2d 130, 136 (Miss. 1987); ***Ladner v. State***, 584 So.2d 743, 758 (Miss. 1991). In ***Ladner***, where there were two victims at the scene, this Court stated:

¶96. In overruling Ladner's request for a mistrial, the trial judge stated:

**As to the second victim at the scene, the two cases are so intertwined it's impossible...to disassociate one from the other. There must be some lapping into the second victim because the second victim was found right there at the scene with a bullet in her head, too. They can't go into the detail that they could go into if the defendant were on trial for the second victim today, but there is necessarily going to have to be some testimony that concerns itself with the other capital murder charge**.

**The references made...were necessary to tell the complete story of the crime. Both were killed in Holden's mobile home with the same gun**. See ***Griffin v. State***, 504 So.2d 186, 191-92 (Miss.1987).

**The issue is rejected.**

*Ladner*, 584 So.2d at 758 (emphasis added).

¶97. Other cases cited by the majority provide clear authority for allowing evidence of other crimes to be admitted into evidence. *See Hurns v. State*, 616 So.2d 313, 321 (Miss. 1993); *Griffin v. State*, 504 So.2d 186, 191 (Miss. 1987); *Stringer v. State*, 500 So.2d 928, 930 (Miss. 1986); *Robinson v. State*, 497 So.2d 440, 442 (Miss. 1986); *Davis v. State*, 476 So.2d 608, 609 (Miss. 1985); *Neal v. State*, 451 So.2d 743, 759 (Miss. 1984). The probative value of telling a complete story as to the crime scene and what other possible scenarios that might have occurred at the time of the crime required admitting evidence of the other crimes within the guidelines established by the rules of evidence and case law; and therefore, the admittance here outweighs any resulting prejudice under Rule 403. The majority emphasizes that it is the "necessity" to use the evidence of the three other killings to tell a coherent story that is the key to its admissibility, citing *Stringer*. However, neither Rule 404(b) nor the comment thereon states that it must be "necessary" to prove motive, opportunity or one of the other listed factors in order to be admissible. I find *Stringer* to be distinguishable. Although this is a close call, I do not agree that the evidence admitted requires reversal.

### 2. The Prosecutor's conduct did not result in the denial of Flowers's fundamental right to a fair trial.

¶98. The majority cites three specific incidences as being prosecutorial misconduct requiring reversal. I respectfully disagree.

¶99. The first incident cited as error was the State's tactic in cross-examination of defense witnesses. I believe that the prosecution had a good faith basis for asking the questions that were asked of the defense witnesses and that it was up to the defense to challenge the questions asked. The defense chose not to challenge. At no time did the prosecution deny the defense the opportunity to question these witnesses about these statements. The impeaching witnesses were available to provide the impeaching statements. They were just not called upon to do so. While I agree with the majority that the prosecution should not use prior inconsistent statements to place before the jury substantive evidence that is otherwise not admissible, I respectfully submit that the prosecution had provided these statements to the defense in discovery and that the defense chose not to pursue these matters. The cases cited by the majority are distinguishable in that the witnesses involved were the State's own witnesses or the defendant, which can involve a different line of questioning. The key point here is for the questions to have a basis in fact, which they did. Any error was not so prejudicial that it could not have been corrected by the defense. Without a contemporaneous objection, this Court is without the necessary tools to decide if a miscarriage of justice has occurred. In light of the fact that there was a strong possibility for bias and that the witnesses were available if the defense had wanted to question them, the fact that the questions were asked, in this situation, was not so inflammatory as to necessitate the trial court's objecting on its own motion or to require finding of reversible error by this Court.

¶100. The second incident cited by the majority as error concerned the prosecutor's use of a tape recording not admitted into evidence. Flowers had admitted during cross-examination that he had given a taped interview. Actually two different statements were given by Flowers and there was arguably some confusion and inconsistency regarding the statements. Defense counsel had the opportunity during re-direct to clear up any confusion over what was on the tape. Defense counsel could have had the tape introduced and

admitted into evidence, but he did not. I concede that the trial judge could have allowed more discussion on this issue, but since the contents of the tape had been discussed in trial, any error was not such that it required reversal in this case. I respectfully disagree with the majority's finding that this conduct was prosecutorial misconduct warranting reversal.

¶101. The third incident cited by the majority as error occurred in the questioning of Lola Flowers during the sentencing phase. Ms. Flowers offered that her son was not capable of being violent in any way. Over defense counsel's objection, the State then questioned Ms. Flowers about her son's shooting of one James Townsend. I do not believe the trial judge erred in allowing the questioning to continue. Once a defense witness makes this kind of statement in the sentencing phase, the State has a right to rebut the witness's testimony by challenging the knowledge of the witness and to use the information within the permitted limits of prior case law. *Finley v. State*, 725 So.2d 226, 239 (Miss. 1998); *Lanier v. State*, 533 So.2d 473, 487 (Miss. 1988).

### 3. The trial court did not commit error by overruling Flowers's objections to the testimony of Jack Matthews.

¶102. The majority finds that error occurred when the trial court, over objections from the defense, allowed Investigator Matthews to testify from a business ledger which indicated money was missing from the furniture store, since the evidence of a robbery was "extremely minimal." I respectfully disagree.

¶103. The fact that the ledger qualified as a business record under M.R.E. 803(6) gave this piece of evidence credibility. The fact that it was a simple document not requiring an expert's interpretation should have allowed it to be introduced by Matthews. Even if Ballard, Tardy's daughter who was involved in the business and had personal knowledge of the ledger, had not been available to interpret the ledger, in my opinion it still would have been admissible and could have been interpreted by the investigator. In the case sub judice, no harm occurred, especially since Ballard's interpretation of the ledger corroborated Matthews's testimony. I disagree with the majority's finding of clear abuse when the judge overruled the defense's objection that the ledger was hearsay. At common law hearsay exceptions developed which furnished guarantees of truth-worthiness and reliability which have been incorporated into the hearsay provisions of the uniform rules. See M.R.E. 803. Judicial discretion is required to determine the admissibility of evidence under this rule, and the judge's ruling will not be overturned on appeal exce pt for an abuse of discretion. *Leatherwood v. State*, 548 So.2d 389, 401 (Miss. 1989) (citing *United States v. Friedman*, 593 F.2d 109, 118 (9th Cir.1979)). The "custodian" of the records was unavailable to testify at trial, as she was one of the victims found dead at the scene of the crime. Thus the foundation for introduction of the business records was established through Matthews, the investigator who discovered the records at the scene and through Tardy's daughter (Ballard) both of whom were qualified witnesses under M.R.E. 803. The ledger was a necessary and reliable source of evidence since the bookkeeper was not available to testify. Once it was admitted, its contents did not require an expert to describe what it contained. The defense was able to cross-examine both Ballard and Matthews as to the contents of the ledger. The jury was able to then evaluate the reliability of the evidence. While I respectfully disagree with portions of the majority's analysis on this issue, I agree with the majority's finding that the better practice would have been to allow only Ballard to testify about the ledger's contents.

### 4. Flowers was not denied his fundamental right to a fair trial by the cumulative effect of the matters addressed above.

¶104. The final error cited by the majority as cause for reversing the trial court is the cumulative impact of the previously discussed errors in Flowers's trial. Citing ***Jenkins v. State***, 607 So.2d 1171, 1183-84 (Miss.1992); ***Griffin v. State***, 557 So.2d 542, 552-53 (Miss.1990); and ***United States v. Garza***, 608 F.2d 659, 665 (5th Cir.1979) (case law will allow a cumulation of otherwise harmless error to result in reversal), the majority applied heightened scrutiny in its review of this case and found sufficient cumulative effect to require reversal. Again, I respectfully disagree. While this was not a perfect trial, by any measure, I do not believe that the errors which occurred require reversal. I would affirm Flowers's conviction and sentence as ordered by the Montgomery County Circuit Court.